[No. A028282. First Dist., Div. One. May 20, 1986.]

RICHARD BUSSEAR, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD,
RUSSELL L. PILLARD et al., Respondents.

## COUNSEL

Isaac Fluss for Petitioner.

Gary J. Lee, Richard A. Krimen, Michael J. Brodie, Arthur Hershenson, Fernando Da Silva and William B. Donohoe for Respondents.

## OPINION

**RACANELLI, P. J.—** ■ ■ ■ ■ Petitioner Richard Bussear (applicant) seeks review of a decision of the Workers' Compensation Appeals Board (Board) denying reconsideration of an order of the workers' compensation judge who in turn had denied applicant's appeal from an order of the Rehabilitation Bureau (Bureau) terminating rehabilitation benefits.[1] For the reasons we explain, we annul the challenged decision and remand for further proceedings.

### BACKGROUND

Applicant, a 25-year-old working foreman and heavy-equipment operator employed by respondent Russell L. Pillard, dba Red Lava Products, sustained industrial injury on August 24, 1978, when his right arm was caught in the conveyor of a rock crusher. Applicant underwent 18 operations but was left with little functional use of his right arm. After applicant had reached maximum improvement, respondent insurance carrier, State Compensation Insurance Fund (Fund), offered applicant vocational rehabilitation services and assigned a vocational rehabilitation consultant, James C. McGowan, to develop an appropriate plan.

McGowan ultimately developed a Bureau-approved plan to retrain applicant under the provisions of Labor Code section 139.5 to be a class 1 heavy-duty truck driver. We will hold that the retraining of an essentially one-armed injured worker to be a heavy-duty truck driver does not qualify, under the circumstances shown to exist in this matter, as "services reasonably necessary to provide an injured worker with the opportunity to return to *suitable gainful employment.*" (Cal. Admin. Code, tit. 8, § 10003, subd. (f), italics added.)

### DISCUSSION

Section 139.5 provides for the establishment, within the Division of Industrial Accidents, of a rehabilitation unit, to include appropriate profes-

---

[1]The Bureau was established within the Division of Industrial Accidents pursuant to the authority of Labor Code section 139.5 (Cal. Admin. Code, tit. 8, § 10003), and rules and regulations were duly adopted which authorized the initiation of vocational rehabilitation services (*id.,* § 10005). The rules provide that rehabilitation plans shall be submitted to the Bureau for approval or disapproval (*id.,* § 10006), and where questions arise concerning an employee's entitlement to benefits, the Bureau is authorized to make its own determination (*id.,* § 10007). An injured worker may appeal to the Board an adverse decision of the Bureau (*id.,* § 10008). Thus, in the area of rehabilitation benefits, the Bureau operates under the appellate supervision of the Board. (*Bekins Moving & Storage Co.* v. *Workers' Comp. Appeals Bd.* (1982) 137 Cal.App.3d 665, 672 [187 Cal.Rptr. 226].)

sional staff, with the duty to foster, review, and approve rehabilitation plans developed by a qualified rehabilitation representative of the employer, insurance carrier, state agency, or employee. Section 139.5, subdivision (c), provides: "When a qualified injured worker chooses to enroll in a rehabilitation program, he . . . shall continue to receive temporary disability indemnity payments, plus additional living expenses necessitated by the rehabilitation program, together with all reasonable and necessary vocational training, at the expense of the employer or the insurance carrier, as the case may be."

The statutory objective sought to be achieved is to get the injured worker from "the bed to the job" by the provision of appropriate vocational training. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 232-233 [110 Cal.Rptr. 144, 514 P.2d 1224].) Furthering the injured worker's rehabilitation subserves the primary purpose of the workers' compensation laws, which is "'to insure to the injured employee and those dependent upon him adequate means of subsistence while he is unable to work and also to bring about his recovery as soon as possible in order that he may be returned to the ranks of productive labor. By this means society as a whole is relieved of the burden of caring for the injured workman and his family, and the burden is placed upon the industry.' [Citation.]" (*Id.,* at p. 233; *Los Angeles Unified School Dist.* v. *Workers' Comp. Appeals Bd.* (1984) 150 Cal.App.3d 823, 828 [198 Cal.Rptr. 116].)

The record shows that prior to drafting the vocational rehabilitation plan, McGowan was in possession of certain medical reports, including a report by Dr. Hadley dated March 21, 1981, which described applicant's disability as one which "completely precludes the use of the right upper extremity" and recommended rehabilitation training *commensurate with a one-armed individual.* In a May 6, 1981, report, Dr. Brownstein expressed full agreement with Dr. Hadley's opinion; several months later Dr. Brownstein reported that the "severe functional limitations of the right arm [created] doubt that any useful work could be performed using it." Thus McGowan was aware that the proposed plan would have to take into account the fact of applicant's "essentially . . . non-functional right upper extremity." During vocational testing, McGowan learned that applicant had an above-average mechanical aptitude and explored several vocational possibilities with applicant, including truck driving. Applicant, whose educational limitations ruled out certain occupational prospects, expressed interest in truck driving. Applicant believed that with his extensive experience operating heavy equipment, he could continue to operate heavy rigs equipped with power steering and shift controls. Although McGowan had reservations about retraining as a truck driver due to the limitations of applicant's "severe disability" and

the potential job discrimination posed by the injury, he resolved his doubts by sending applicant to the United Truck Driving School for training and "evaluation." The supervised training consisted of taking applicant out for a "test drive on the freeway near the school and then off into industrial/ warehouse areas where he could complete figure 8's and U-turns." The consultant concluded from the resulting evaluation (based on one and one-half hours operating a diesel-powered tractor trailer rig performing figure 8's and U-turns) that he was "physically capable" of performing that type of work.

In March of 1982, a detailed vocational rehabilitation plan was presented to applicant and submitted to the Bureau by the employer. The plan describes the nature of applicant's "crushing injury," including nerve and tissue damage, and listed the medically diagnosed physical limitations which precluded use of the entire right upper extremity and "fingers' activities involving grasping, lifting, pulling, holding, pushing, carrying or any gross/ fine maneuvers of dexterity of fingers of right hand."

The plan as approved by the consultant provided for five weeks of combination classroom and on-the-road truck driving training at United Truck Driving School, the Department of Motor Vehicles test for a class 1 driver's license,[2] followed by an additional four weeks of job search assistance.[3]

Upon completion of the prescribed training and qualification for a class 1 driver's license, applicant continued to receive vocational rehabilitation temporary disability benefits during the ensuing 12 weeks while he diligently sought employment. On May 25, 1982, McGowan reported to the Fund that despite applicant's best efforts, there had been no movement in the labor market that would indicate a job opportunity for him. Two months later, McGowan reported that applicant had been unable to find employment in the depressed labor market and that no further rehabilitation services were in order. He recommended that the case be closed.

On August 10, 1982, the Fund filed with the Bureau a request for case closure (Cal. Admin. Code, tit. 8, § 10004, subd. (e)) on the ground that

---

[2]The examination for a class 1 driver's license, which would permit the applicant to drive any combination of vehicles, includes a medical examination of the applicant by a physician but "[a]ny physical defect of the applicant, which, in the opinion of the department, is compensated to ensure safe driving ability, shall not prevent the issuance of a license to the applicant." (Veh. Code, § 12804, subd. (a); see also Cal. Admin. Code, tit. 13, §§ 100.10, 100.11.)

[3]In fact, applicant began and completed his training and embarked upon a job search before the Bureau's approval of the plan.

the rehabilitation plan had been completed, although applicant had been unable to find employment. Applicant's counsel objected that "even in the best of times, there is [no] substantial labor market for a one-armed truck driver," arguing that the Fund's obligation was unfulfilled until applicant had been successfully rehabilitated for suitable occupation. The Bureau's consultant reviewed the vocational reports and notified applicant of her intention to close the case and terminate carrier liability unless other convincing evidence was furnished within 20 days. In reply, applicant's counsel advised he had recently learned that applicant had encountered difficulties during training after driving a four-hour shift, and that the plan was improperly "beyond the employee's physical capabilities." Counsel requested continuance of temporary disability indemnity pending arrangements for a further medical/legal examination due to the onset of symptoms encountered by applicant in favoring his right side causing torsional back strain.

On October 18, 1982, the Bureau rejected applicant's claim of the original plan's inadequacy and issued its decision finding that the Fund had provided the employee with a reasonable opportunity to return to suitable gainful employment by providing substantial vocational rehabilitation services, and that no further services would be authorized.

Applicant renews his argument below, that retraining him as a truck driver does not constitute adequate rehabilitation, that respondents have not discharged their responsibilities, and that he should be afforded a "second" or "real" chance to obtain the full benefit of the remedial statutory provisions.

At the hearing on appeal from the Bureau's closure order, applicant testified that as a result of the injury to his major hand, he had yet to attain a reasonable level of facility using his left hand. He had chosen truck driving, he testified, in the belief it would be easier—in fact experiencing little difficulty during the pretraining evaluation involving only *one* gear operation—but soon discovered that the work was far more strenuous than anticipated. Applicant stated that he drove only 22 hours during the training course, usually in 4-hour shifts. At the end of each shift, he felt exhausted and experienced pain from both his injured arm and back. As a consequence, applicant began to doubt his ability to perform as a working truck driver; however, he neglected to inform his school instructors or the rehabilitation consultant (during the three-month job-search period) in the hope he might succeed once a job became available. Despite applicant's diligent efforts, he remained unemployed.

McGowan testified as to his own reservations about the retraining plan because of applicant's physical limitations and the restricted labor market

in Lake County. McGowan's concern motivated the pretraining evaluation by the school director who ultimately provided a positive evaluation and progress report. At McGowan's request, Dr. Brownstein, applicant's attending physician, reviewed the plan and reported on April 14, 1982, that he had given him a "medical release for *job-search.*" (Italics added.) The terse report contained no expression of opinion, however, concerning applicant's ability to perform the full range of duties of a heavy-rig operator. McGowan denied that applicant told him that he could not drive a truck longer than four hours a day.

Numerous medical reports were introduced at the hearing. Dr. Damon reported that applicant had low back pain resulting from major adjustments to his body mechanics caused by the injury to his dominant arm. Dr. Damon felt that applicant had not been "adequately rehabilitated" and recommended training in an occupation that would enable him to use only his left hand.

In contrast, Dr. Kilgòre's March 21, 1983, report in behalf of the Fund noted that applicant was "already rehabilitated" and was "[c]onsidered able to work as a truck driver *in a limited capacity.*" (Italics added.) Finally, Dr. McCarroll's corroborating report of August 29, 1983, that applicant was already rehabilitated to perform as a truck driver was contradicted by his earlier report (Mar. 21, 1983) in which he stated that the patient's recent complaints of limited painful use of his injured arm and the concomitant unlikelihood of employment as a truck driver *"seem quite justified considering the severe nature of his right upper extremity problem. I would think that rehabilitation in a different line of work would be reasonable."* (Italics added.)

A review of the governing regulations is instructive. A "'Qualified Injured Worker'" is defined as "an employee: (1) The effects of whose injury, whether or not combined with the effects of a prior injury or disability, if any, permanently preclude, or are likely to preclude the employee from engaging in his or her usual and customary occupation or the position in which he or she was engaged at the time of injury; and [¶] (2) Who can reasonably be expected to return to *suitable gainful employment* through the provision of vocational rehabilitation services." (Cal. Admin. Code, tit. 8, § 10003, subd. (c), italics added.)

"'Vocational Rehabilitation Service'" is defined as "those services required to determine an employee's eligibility as a qualified injured worker, and those services reasonably necessary to provide an injured worker with the opportunity to return to *suitable gainful employment.* Such services may include, but are not limited to, medical and/or vocational evaluation, counseling, job analysis, job modification assistance, retraining, including on-

the-job training or training for alternative employment with the same employer, and job placement assistance." (Cal. Admin. Code, tit. 8, § 10003, subd. (f), italics added.)

"'Suitable Gainful Employment'" is defined as "that employment or self-employment which is *reasonably attainable and which offers an opportunity to restore the employee as soon as practicable and as near as possible to maximum self-support,* due consideration being given to the employee's qualifications, interests and incentives, pre-injury earnings and future earning capacity, and the present and future labor market." (Cal. Admin. Code, tit. 8, § 10003, subd. (h), italics added.)

The workers' compensation judge concluded that the decision of the Bureau was correct because applicant himself chose the field of truck driving despite knowledge of the potential problems and failed to raise any objections to the rehabilitation plan at any relevant time.

It thus appears that the judge adopted the Bureau's implicit position that applicant would have to live with the consequences of his informed choice. But unlike the Bureau's consultant whose decision rested on the reports on file, the judge heard the testimony of the employer's rehabilitation consultant concerning his reservations from the outset whether retraining as a heavy-duty truck driver was a suitable plan, and that he did not learn of the four-hour limitation until the day of the hearing. In addition, applicant's testimony of his limited performance ability was unrefuted as was evidence of applicant's failure to mention his limitation to his consultant or the school as well as his attorney who learned of it only after the Fund had sought closure of the case and subsequent discussion with his client.

It bears emphasis that the legislative purpose in enacting section 139.5 was to enable injured workers to participate in rehabilitation training to the fullest extent possible. (*LeBoeuf* v. *Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 234, 244 [193 Cal.Rptr. 547, 666 P.2d 989].) Although the applicant's "interests" are among the factors to be considered by the vocational rehabilitation consultant in preparing a vocational rehabilitation plan (Cal. Admin. Code, tit. 8, § 10003, subd. (h)), we think the rehabilitation consultant, possessed of training and expertise in this area, should have considered the applicant's interests *in light of his physical limitations.* As applicant points out, if the injured employee were capable of formulating a suitable rehabilitation plan, there would be no need for rehabilitation consultants. Since the proposed plan was suspect from the start, once applicant's attorney had communicated to the Bureau the limitations disclosed during training casting further doubt upon the suitability of the plan, the Bureau had the responsibility, before closing the case, to

inquire further into the matter and to order necessary and reasonable medical examinations, if required (Cal. Admin. Code, tit. 8, § 10007, subd. (a)),[4] in order to determine whether it might be appropriate to "modify, interrupt or terminate" the plan (*id.*, § 10007, subd. (c)).[5]

Here applicant, profoundly injured at the age of 25, faces another 40 years in a competitive labor market. The purpose of rehabilitation—to return the injured worker to a productive status in the interests of himself and his family—is not met by a vocational rehabilitation plan beyond the injured worker's physical capacity and which does not provide him with a meaningful opportunity to return to suitable gainful employment.

The order of the Board is annulled, and the matter is remanded to the Board for further proceedings consistent with the views expressed in this opinion.

Newsom, J., and Holmdahl, J., concurred.

---

[4]California Administrative Code, title 8, section 10007, subdivision (a), provides: "Where there are questions concerning an employee's entitlement to vocational rehabilitation services, or an employer's failure to offer a rehabilitation plan to the employee, or where a plan is unacceptable to the employee or employer, the Bureau, either on its own motion or upon the request of either party, may:

"(1) require the parties to submit written statements of position relative to any disputed issues, or

"(2) meet and confer informally prior to granting a conference, or

"(3) schedule a conference, or

"(4) order necessary and reasonable medical examinations and vocational examinations to be conducted at the expense of the employer, or

"(5) refer to submitted medical and vocational reports to determine the practicality of, need for and kind of vocational rehabilitation services, if any, necessary to provide the employee with an opportunity to return to suitable gainful employment.

"After allowing the parties an opportunity to present information supporting their respective positions, the Bureau shall issue its determination and serve copies on the parties."

[5]California Administrative Code, title 8, section 10007, subdivision (c), provides: "(c) Upon the request of either the employee or employer, or upon its own authority, the Bureau may modify, interrupt or terminate a vocational rehabilitation plan."