[No. S129794. May 25, 2006.]

JOHN STEPHENS, Plaintiff and Appellant, v.
COUNTY OF TULARE et al., Defendants and Respondents.

794

## COUNSEL

Thomas J. Tusan for Plaintiff and Appellant.

Kathleen Bales-Lange, County Counsel, Ron Rezac, Chief Deputy County Counsel, and Crystal E. Sullivan, Deputy County Counsel, for Defendants and Respondents.

Kathleen Bales-Lange, County Counsel (Tulare) and James G. Line, Deputy County Counsel, for Tulare County Employees' Retirement Association as Amicus Curie on behalf of Defendants and Respondents.

Raymond G. Fortner, Jr., County Counsel (Los Angeles) and Stephen R. Morris, Principal Deputy County Counsel, for California State Association of Counties and the California League of Cities as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**WERDEGAR, J.**—We must decide whether a county employee was dismissed for disability within the meaning of Government Code section 31725. If he was so dismissed, because the county board of retirement ruled he was not entitled to a disability retirement the county would be required to reinstate him to his old job, together with back wages and benefits. Because we conclude the trial court ruled correctly that the employee was not dismissed from his job, we reverse the decision of the Court of Appeal.

## FACTS

John Stephens began working for the Tulare County Sheriff-Coroner as a detention specialist III in December 1994. He was assigned to the Bob Wiley Detention Facility, where his job entailed working on the floors with jail inmates, transporting inmates, and writing reports. His job also required him to carry a firearm. In the course of his duties, in 1995 he suffered an injury to his right thumb. In 1996 he injured his thumb again and spent some time away from work. When he returned to work, his employer modified his job to "light duty" pursuant to the recommendation of his physician, Dr. John Edwards. In this new position, Stephens was assigned to a housing unit control room, requiring him to open and close the security doors in the jail for the other detention officers by pushing buttons using both hands. It was anticipated that when the jail became fully staffed, Stephens would rotate into the central control room, where his work would also involve pushing a button to open a security door. Captain Janet Perryman testified that the button-pushing duties in the control room of a housing unit and in the central control room were not significantly different.

When Stephens complained his modified light duty was inconsistent with the limitations recommended by Dr. Edwards, he was examined by a hand specialist. The specialist's June 17, 1997, report acknowledged Dr. Edwards's recommendation "that the client perform no longer than 15–20 minutes of upper extremity activity at one period of time and then have a break," but

concluded: *"Currently the control room officer job is adhering to this prescription.* The client is able to do 5–15 minutes of hand tasks and then patrol the control room for one to five minutes without using his hands. The client does use his hands frequently but not at a constant rate and is able to take a break after 15–20 minutes of hand activity." (Italics added.) Following this report, Stephens apparently continued in his modified light-duty position and was in fact rotated into the central control room.

Stephens testified that in September 1997, while performing this modified light duty, Sergeant Montoya, one of his supervising sergeants, approached him and asked how he was doing. Stephens told him his thumb was bothering him, but he denied he asked Sergeant Montoya to be relieved.

Sergeant Sheri Lehner, another of Stephens's supervising sergeants, also testified to events occurring in September 1997. She reported that Stephens had approached her and complained that "there was a misunderstanding as to what his light duty was supposed to be," and that "he was suffering from pain in his thumb, due to his job assignment." Sergeant Lehner confirmed that, following a shift, Stephens's thumb was in fact red and swollen. He told her he was not supposed to use his thumb for more than 15 minutes at a time. Because persons performing Stephens's job worked 12-hour shifts, Sergeant Lehner thought it would be infeasible for Stephens to take a break every 15 minutes.

Sergeant Lehner also testified that Stephens told her not to be "surprised when things start happening" when he was rotated from the housing unit control room into the central control room, that he would call his lawyer, and he would "own the County" because in his last lawsuit, which was success- ful, the trial court had informed everyone that reassigning him would be considered a discriminatory act.[1] Stephens boasted of his attorney's legal prowess and said that "this time we'll sue for money." Sergeant Lehner reported this conversation to her superiors.

In light of Stephens's complaints, Captain Perryman sent him a letter that forms the basis of his claim he was dismissed from his job. The letter, dated September 12, 1997, stated in pertinent part:

"You have been working in a modified work assignment (light duty) at the Bob Wiley Detention Facility due to an injury to your right hand. Your doctor, John Edwards, has described your restrictions as 'no inmate contact, some right hand activities—no more than (2) hours per day, writing limita- tions of 15–20 minute intervals, no power gripping or pulling of the right

---

[1] The lawsuit to which Stephens refers is not explained, although he had filed eight different workers' compensation claims between 1994 and 1997.

hand.' The Department has made efforts to accommodate your return to work and reviewed job assignments and duties performed in the Division. The tasks required in operating a control room at the facility appeared to accommodate the doctor's listed restrictions for use of your right hand. You have in fact worked in a housing control room for sometime [*sic*].

"On 9-8-97 you notified Sergeant C. Lehner that you believed there was a misunderstanding about your light duty and the restrictions. It was your opinion that working in Central Control would result in compromising those restrictions.

"You were assigned to Central Control and given the task of training Detention Service Officer Rosario. You worked Central Control and when going off duty on 9-10-97 you spoke to Sergeants Lehner and Montoya. You were asked how your hand was and responded that it was swollen.

"Because of your statements we believe that we will not be able to provide a modified work assignment at this time. This letter is to confirm to you that you are not to return to work until further notice. At such time as your condition improves and you are able to return to work with no restrictions, or improves to the point that you are able to perform the 'light duty' tasks required in Central Control without further complaint or injury, you will be expected to submit time sheets reflecting OFF DUTY/SICK/PERSONAL. I understand you have an open job injury claim for this problem ([Lab. Code, §] 4850) that has yet to be resolved. Until notified by Worker's Compensation we will expect your time sheets to reflect use of your personal sick leave."

Captain Perryman testified:[2] "The letter was generated . . . to make sure that [Stephens] understood that our concern for him was that we not further injure his thumb. And that he needed to do what had to be done in terms of return[ing] to work, with no restrictions, as a . . . Detention Specialist [III], which is commonly referred to as a gun-toter. Or to be well to the point where he could serve in the capacity of a Detention Service Officer, which is the light-duty position that we had temporarily provided him with." Captain Perryman further testified she did not intend the letter to be a "dismissal from employment"; it was her understanding the letter left open the possibility of Stephens's return to work in either a light-duty capacity or performing the full range of duties as a detention specialist III. She testified the sheriff's department had taken no affirmative steps to terminate Stephens and, when asked whether Tulare County had "actually terminated him from [the] county payroll, paid him off for any accrued leave," she answered: "No, not at all."

---

[2] By the time of trial, Captain Perryman had been promoted to assistant sheriff in charge of adult jail facilities and her last name had changed to Hinesly. We will continue to refer to her as Captain Perryman in this opinion, as that was her name at the time of the events giving rise to this lawsuit.

After receiving Captain Perryman's letter, Stephens did not return to work. Asked at trial whether he was terminated from his employment "shortly after 1997," that is, after he received Captain Perryman's letter, he replied: "Not to my knowledge." Asked whether he had ever received a termination notice, he replied: "No. No termination."

For the rest of 1997, and until December 19, 1998, Stephens received full pay from Tulare County in the form of his sick and personal leave and then benefits pursuant to Labor Code section 4850.[3] Following cessation of his section 4850 benefits in late 1998, he participated in vocational rehabilitation and was trained to become a computer technician. After completion of that training, Stephens twice sought positions with the county but was unsuccessful in obtaining a job. He worked various part-time jobs with other, private employers in 1998; during this time he also received a compromise and release for $7,000, settling one of his workers' compensation cases (see fn. 1, *ante*).

Stephens applied for a disability retirement with the Tulare County Employees' Retirement Association (TCERA) on November 18, 1998. While his application was pending, Tulare County informed him of an opening for a job he could perform consistent with his medical limitations, but withdrew the offer of employment when the county decided not to fund the position. TCERA's Board of Retirement subsequently denied his application for a disability retirement, and the superior court denied his petition for a writ of mandamus. He then sent a letter to the Tulare County Sheriff-Coroner demanding reinstatement pursuant to Government Code section 31725. He also filed a government tort claim, seeking payment of retroactive wages pursuant to the same statute, which the county denied.

Stephens's employer then sent him a letter dated December 5, 2002, explaining that, "As it is the decision of the Board of Retirement that you are not substantially incapacitated, and thus able to work, the County is ready to reinstate you to employment." The letter asked him to contact a designated person "to initiate an interactive review of restrictions per ADA/[FEHA], to discuss arrangements for your return to work and to discuss your new assignment." The letter also gave Stephens the option of not

---

[3] Labor Code section 4850 provides: "(a) Whenever [a qualified law enforcement officer] . . . is disabled, whether temporarily or permanently, by injury or illness arising out of and in the course of his or her duties, he or she shall become entitled, regardless of his or her period of service with the city, county, or district, to a leave of absence while so disabled without loss of salary in lieu of temporary disability payments or maintenance allowance payments under Section 139.5, if any, which would be payable under this chapter, for the period of the disability, but not exceeding one year, or until that earlier date as he or she is retired on permanent disability pension, and is actually receiving disability pension payments, or advanced disability pension payments pursuant to Section 4850.3."

returning to work and stated that if he did not contact the designated person by December 20, the sheriff-coroner would assume he was not returning. Stephens's attorney contacted the designated person to begin the process of reinstatement.

When Stephens had not been reinstated by May 23, 2003, he filed a petition for writ of mandate in superior court, seeking reinstatement and repayment of back wages and benefits pursuant to Government Code section 31725. On June 11, 2003, he received a response letter from the sheriff-coroner, informing him he had been reinstated to the sheriff's department. Stephens returned to work for the sheriff's department on July 1, 2003, and performed the same modified light duty the sheriff-coroner had made available in 1997. Asked whether "prior to returning in July of '03 . . . did your condition change such that you could work the light-duty functions that you had been working in '97," he replied: "There was no change. It has been the same."

The trial court issued an alternative writ but ultimately denied relief. The court concluded Captain Perryman's September 12, 1997, letter "contemplates that Mr. Stephens is still an active County employee utilizing leave time. At no time was Mr. Stephens advised in this letter that he was dismissed from employment. Although the letter does state 'do not return to work until further notice,' it goes on to tell Mr. Stephens that he will be placed on sick leave until he can report back to work under certain conditions. These were conditions that only Mr. Stephens could determine. . . . Mr. Stephens always had a doctor's release and could have gone back to work if he had informed the County that he was willing and able. At no time did Mr. Stephens advise the County that he considered this a dismissal." The trial court found that because Stephens did not seek a new medical evaluation of his thumb after receiving Captain Perryman's letter or seek reinstatement with the county during this time period, "the only reasonable determination the court can make is that Mr. Stephens could have been performing these duties all along but never complied with the letter of September 12, 1997, by informing the County that he could perform."

The Court of Appeal reversed, and we granted review.

## DISCUSSION

Resolution of the present dispute requires us to interpret the meaning of Government Code section 31725 (section 31725). That statute provides in full: "Permanent incapacity for the performance of duty shall in all cases be

determined by the board.[4] [¶] If the medical examination and other available information do not show to the satisfaction of the board that the member[5] is incapacitated physically or mentally for the performance of his duties in the service and the member's application [for a disability retirement] is denied on this ground the board shall give notice of such denial to the employer. The employer may obtain judicial review of such action of the board by filing a petition for a writ of mandate in accordance with the Code of Civil Procedure or by joining or intervening in such action filed by the member within 30 days of the mailing of such notice. If such petition is not filed or the court enters judgment denying the writ, whether on the petition of the employer or the member, *and the employer has dismissed the member for disability*[,] *the employer shall reinstate the member to his employment effective as of the day following the effective date of the dismissal.*" (Italics added.)

■ In other words, if (1) the county board of retirement rules an applicant/employee is not permanently disabled so as to be entitled to a disability retirement, (2) the board denies the employee's disability retirement application on that ground, and (3) no appeal is filed or all appeals are final, then the applicant/employee is entitled to reinstatement to his or her prior position if (4) the employing county has previously "dismissed" the employee "for disability." (§ 31725.) Section 31725, where applicable, has been interpreted to require not only reinstatement but also payment of wages and benefits that would have accrued during the period of dismissal. (*Leili v. County of Los Angeles* (1983) 148 Cal.App.3d 985 [196 Cal.Rptr. 427] (*Leili*); see generally *Tapia v. County of San Bernardino* (1994) 29 Cal.App.4th 375, 387 [34 Cal.Rptr.2d 431] (*Tapia*) [applicant must comply with statutory claim presentation requirements].)

That Stephens applied for a disability retirement, the county board of retirement denied his application on the ground he was not disabled, and all appeals are final is not disputed by the parties, thus satisfying the first three prerequisites to reinstatement under section 31725. The only question remaining is whether the county dismissed Stephens for disability within the meaning of section 31725.

■ "When interpreting statutes, 'we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law . . . . "This court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed." ' " (*Equilon Enterprises v.*

---

[4] Reference to the "board" refers to the county board of retirement. (Gov. Code, § 31459, subd. (c).)

[5] Reference to a "member" refers to members of a retirement association (Gov. Code, § 31470), including "[a]ll sheriffs, undersheriffs, chief deputies sheriff, jailers, turnkeys, deputies sheriff" (*id.*, § 31470.2).

*Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 59 [124 Cal.Rptr.2d 507, 52 P.3d 685].) "Because the statutory language is generally the most reliable indicator of that intent, we look first at the words themselves, giving them their usual and ordinary meaning and construing them in context. [Citation.] If the plain language of the statute is clear and unambiguous, our inquiry ends, and we need not embark on judicial construction. [Citations.] If the statutory language contains no ambiguity, the Legislature is presumed to have meant what it said, and the plain meaning of the statute governs." (*People v. Johnson* (2002) 28 Cal.4th 240, 244 [121 Cal.Rptr.2d 197, 47 P.3d 1064].)

■  Applying these principles here requires us to discern the plain meaning of the word "dismissed" as used in section 31725. To "dismiss" means to "send or remove from employment." (Webster's 3d New Internat. Dict. (2002) p. 652.) As used in connection with section 31725, "dismissed," "terminated," and "released" all share a common meaning. Those terms describe a circumstance in which the employment relationship, at the employer's election, has ended. Because the relationship has ended, (1) the employer no longer has an obligation to pay salary or other forms of compensation, and (2) the employee has no basis for expectation that a position exists, will be kept open, or will be made available upon the employee's offer to return to work. Because section 31725 is concerned only with the consequences of "[p]ermanent incapacity for the performance of duty," we can reasonably assume the statute addresses permanent, not merely temporary, absence from employment. An employee who is temporarily absent from the workplace due to illness or vacation, where both employer and employee understand the employee will return to work when the reason for the leave ceases, would have no need to pursue a disability retirement before the board of retirement.

■  In addition, a dismissal as contemplated by section 31725 requires an employer action that results in severance of the employment relationship. An employee who is neither sent away nor removed, but voluntarily absents himself or herself from the job, without more, cannot validly claim he or she was "dismissed" by the employer. An employee who is uncertain of his or her status or the existence of an employment relationship is entitled to seek clarification.

Was Stephens dismissed from his job? Plainly not. The trial court found he injured himself on the job, took medical leave, and then returned to work subject to medical restrictions concerning the use of his right thumb. His employer provided him with a modified light-duty position consistent with those restrictions. Sergeant Lehner testified Stephens nevertheless complained that he was reinjuring his thumb even in this modified light duty, that she observed his thumb was in fact red and swollen, and that he told her his modified light duty was inconsistent with his medical restrictions. Stephens

admitted he told Sergeant Montoya that his thumb bothered him. These express and implied factual determinations are supported by substantial evidence and are thus entitled to deference on appeal. (*Alvarez-Gasparin v. County of San Bernardino* (2003) 106 Cal.App.4th 183, 188 [130 Cal.Rptr.2d 750].)

Stephens's complaints led Captain Perryman to send him the September 12, 1997, letter that forms the crux of this case. The critical portion of the letter provides: "Because of your statements we believe that we will not be able to provide a modified work assignment *at this time*. This letter is to confirm to you that you are not to return to work until further notice. At such time as your condition improves and you are able to return to work with no restrictions, or improves to the point that you are able to perform the 'light duty' tasks required in Central Control without further complaint or injury, you will be expected *to submit time sheets* reflecting OFF DUTY/SICK/PERSONAL. I understand you have an open job injury claim for this problem ([Lab. Code, §] 4850) that has yet to be resolved. Until notified by Worker's Compensation *we will expect your time sheets to reflect use of your personal sick leave*." (Italics added.)

The letter thus directed Stephens to leave work *temporarily* until his medical condition improved and required him to report his absence from the workplace on his timesheets to reflect that he was either off duty or taking sick or personal leave. As the trial court concluded: "At no time was Mr. Stephens advised in this letter that he was dismissed from employment." This factual conclusion was supported by substantial evidence. Captain Perryman testified that she did not intend the letter to be a termination of Stephens's employment, that she anticipated he would return to the job when he had been rehabilitated to the point that he could perform the modified light duty tasks required in the central control room, and that he was never taken off the county's payroll or had his accrued leave time paid off. That the letter expressly instructed Stephens to use his sick leave while away from work is a clear indication it did not constitute a dismissal. Stephens himself testified he did not consider the letter a "termination" nor did he ever receive a formal notice of termination. The county's subsequent offer to bring him back in a different modified position is consistent with the view he had not been dismissed from employment.

In concluding Stephens was dismissed, the Court of Appeal below reasoned that, although he was provided with modified light duty working in the *housing unit* control room, his employer insisted that he rotate into the *central* control room, where his duties would allegedly be physically inconsistent with his documented medical restrictions, thus placing Stephens in the untenable position of either accepting assignment to duties that would injure him or declining to do so and absenting himself from the job.

We respectfully disagree. The county assigned Stephens to perform modified light duty, and the trial court concluded that he "always had a doctor's release to perform the modified duties" and his doctor "never changed his recommendation as to Mr. Stephens' ability to perform this modified position." Although Stephens testified the duties in the central control room were more strenuous because there was "more activity" and "[m]ore use of the hand," and that he could perform the modified light duty in the housing unit control room but not in the central control room, the trial court was not obligated to accept these assertions in the face of other, contrary testimony. For example, Captain Perryman testified: "The primary difference between a person working in a control room of a housing unit and central control, would be who they dealt with and the request to open or close the door or to communicate over the intercom. [¶] In a housing unit, a large percentage of those transactions would have to do with inmates; and in central control you would deal exclusively with staff . . . ." Significantly, when asked whether the actual physical requirements of using your thumb to push buttons was "significantly different" from one assignment to the other, Captain Perryman answered: "No." As the parties presented conflicting evidence on this point, we defer to the trial court's implicit factual determination as supported by substantial evidence.

The Court of Appeal also criticized the trial court's determination that Stephens could have returned to work anytime between 1997 and 2003 if he had chosen to do so, finding this an "illusory" option, as the September 12, 1997, letter premised Stephens's return on his being able to work in the central control room "without further complaint or injury." But as we explained, *ante*, substantial evidence supports the trial court's factual determination that the physical demands of working in the central control room were no different than in the housing unit control room.

In sum, we conclude that applying the plain meaning of section 31725 to the facts of this case supports the county's position that it never dismissed Stephens from his job. Our conclusion is consistent with the legislative intent underlying the statute, as demonstrated by its legislative history. "According to the Report of the Assembly Committee on Public Employment and Retirement . . . , the purpose of amending the Retirement Act was to eliminate severe financial consequences to an employee resulting from inconsistent decisions between an employer and the Retirement Board as to whether a particular employee is incapacitated and unable to perform the duties of his position. Prior to the 1970 amendment of section 31725 [which added the statutory language at issue in this case], a local government employer could release an employee [under a local county rule] and the Retirement Board could deny the employee a disability pension on the ground he was not disabled. The Assembly committee found that, 'As a result of such disputes, approximately one percent of the applicants for a disability

retirement pension have found themselves in the position of having neither a job, nor a retirement income.'

"The committee concluded[:] 'Thus, to remedy this problem, which . . . is virtually a matter of life and death for the very few individuals involved each year, the Public Employees' Retirement System should be given authority . . . to mandate reinstatement of an individual—upon a finding of a lack of disability—but that the employing agency have the right of appeal to the courts.'

"The committee continued: 'Such a method provides a system which involves only two administrative or judicial proceedings instead of three,' since the employee does not have to sue in court on a writ to secure an order to reemploy or an order to pay the disability allowance." (*McGriff v. County of Los Angeles* (1973) 33 Cal.App.3d 394, 399–400 [109 Cal.Rptr. 186] (*McGriff*).)

In enacting section 31725, the Legislature was thus concerned that disputes between local governments and county retirement boards over whether an employee was disabled left such employees in limbo, having neither employment nor disability income. The Legislature solved this problem by giving the retirement board the final word on whether an employee was disabled and providing that dismissed employees must be reinstated if the board found they were not disabled, while also giving local governments the right to take a judicial appeal of the board's decision. In this way, the Legislature ensured that county employees dismissed for disability would have either employment or disability income and not be left destitute. (*Alvarez-Gasparin v. County of San Bernardino, supra*, 106 Cal.App.4th at p. 187 ["The County cannot deny an employee both disability retirement and employment"].) Nothing in this history suggests the Legislature intended the statutory reinstatement remedy to apply to employees who do not face this involuntary financial dilemma, that is, those who are not actually dismissed from their jobs. Nor does this legislative history indicate the Legislature was concerned about employees who choose voluntarily to leave the county's employ. Neither type of employee faces the dilemma of losing a job due to a disability whose existence the board of retirement declines to acknowledge.

Stephens falls outside the class of employees the Legislature intended to protect by enacting section 31725. Captain Perryman, informed by Sergeant Lehner that Stephens was reinjuring his thumb even in the modified light duty to which he was assigned, instructed Stephens to leave work and take sick leave until his medical condition improved to the point where he could return without concern for reinjury. Not only did Captain Perryman's letter presuppose Stephens had the ability to return in the future but, by reporting

his time off as sick leave, Stephens was not faced with the loss of income. Stephens simply did not face the financial dilemma the Legislature intended to address in section 31725.[6]

Although Stephens admits he "was not fired in the sense that his employment status was not terminated," he contends case law has enlarged the meaning of "dismissed" to extend to situations lacking a formal termination or dismissal. The Court of Appeal agreed, summarizing this legal authority thusly: "We begin by reiterating some principles gleaned from the earlier section 31725 'dismissal' cases. First, 'dismissed' does not mean the same thing as 'terminated' or 'fired.' An employee may be effectively dismissed if the county simply takes him or her off active duty (*Leili*[, *supra*, 148 Cal.App.3d 985]), or the employee voluntarily places himself or herself on a disability leave (*Hanna* [*v. Los Angeles County Sheriff's Dept.* (2002) 102 Cal.App.4th 887 [125 Cal.Rptr.2d 686];] *Tapia*[, *supra*, 29 Cal.App.4th 375;] *Phillips* [*v. County of Fresno* (1990) 225 Cal.App.3d 1240 [277 Cal.Rptr. 531]]). This is so even if the employee eventually returns to work because the disability is temporary (*Raygoza* [*v. County of Los Angeles* (1993) 17 Cal.App.4th 1240 [21 Cal.Rptr.2d 896];] *Phillips*), because the employee has been retrained or rehabilitated, or because the employer is able to make the appropriate accommodations. Moreover, an out-of-work employee is no less 'dismissed' because the county has no position available compatible with the employee's work restrictions (*Hanna, Tapia, Raygoza, Phillips*), or even because the employee is, or appears to be, disabled notwithstanding the retirement board's contrary conclusion (*Raygoza, Phillips*). *In short, the fact Stephens was never formally terminated is immaterial to our analysis.*" (Italics added.)

■ Relying on this expansive interpretation of section 31725, Stephens maintains Captain Perryman's September 12, 1997, letter effectively dismissed him. As we explain, although we agree a qualifying dismissal within the meaning of section 31725 need not be accompanied by any particular formality, some form of a termination is nevertheless required. To the extent Stephens and the Court of Appeal assert otherwise, they overstate the reach of prior judicial interpretations of section 31725.

Stephens relies initially on two early cases, *McGriff, supra*, 33 Cal.App.3d 394, and *Leili, supra*, 148 Cal.App.3d 985. In *McGriff*, the employee was

---

[6] Because Stephens claims the September 12, 1997, letter from Captain Perryman effectively dismissed him from his employment, this case, contrary to the Court of Appeal's apparent view, does not pose a situation in which an employee chooses to absent himself from work, believing himself too disabled to work in the only position provided by the employer. Although other remedies may apply in such a case, the remedy provided in section 31725 applies only when an employer dismisses an employee for disability.

"released" from her job "due to her medical incapacity" (*McGriff*, at p. 395) pursuant to a local county civil service rule. The retirement board denied her application for a disability retirement because she was not permanently disabled, and the county denied her request for reinstatement. The trial court ruled she was entitled to reinstatement as of the date she was released from her job and the appellate court affirmed, but without discussing whether a release due to medical incapacity constituted a dismissal within the meaning of section 31725.

*Leili* is similar. In that case, a county firefighter "was taken off active duty" (*Leili*, *supra*, 148 Cal.App.3d at p. 987) after he sustained back injuries, but denied a disability retirement when the county board of retirement found he was not disabled. The *Leili* court ordered the firefighter reinstated pursuant to section 31725. Although the court did not discuss whether being "taken off active duty" was equivalent to being "dismissed," it spoke in terms of the employee being "released" and "terminated." (*Leili*, at p. 988, describing *McGriff*, *supra*, 33 Cal.App.3d 394.)

As a later court explained, "Neither *McGriff* nor *Leili* directly addresses the meaning of the word 'dismissed' in the context of section 31725—both cases assume the employee had been dismissed." (*Phillips v. County of Fresno*, *supra*, 225 Cal.App.3d at p. 1255 (*Phillips*).) Indeed, from all that may be discerned from either court's opinion, the employer's action releasing or removing the employee from active duty in fact constituted a dismissal. Both cases impliedly assume no *formal* dismissal from the job is necessary in order to activate section 31725's protections; an employer's action that has the same effect will do. Neither case is inconsistent with our conclusion in the instant case that a dismissal (in some form) is required before section 31725 can apply.

*Raygoza v. County of Los Angeles*, *supra*, 17 Cal.App.4th 1240, on which Stephens also relies, is inapposite. Raygoza, a deputy marshal, suffered a documented injury to his psyche that precluded him from using a weapon. His employer, the Marshal of the Municipal Courts of Los Angeles County, notified him that he was "relieved of duty (*fired*)" from his job. (*Id.* at p. 1242, italics added.) The dispute centered not on whether Raygoza was in fact dismissed, but on whether the marshal was required to reinstate him when no position compatible with his work restrictions was available.

Stephens also relies on *Phillips*, *supra*, 225 Cal.App.3d 1240, in which the employee, a deputy sheriff, voluntarily requested and received a medical leave of absence without pay. (*Id.* at p. 1245.) The county board of retirement denied his application for a disability retirement, as well as his petition for rehearing. Two days later Phillips sought reinstatement. The county refused,

but the trial court directed it to reinstate him as of the day he sought to end his voluntary leave of absence. (*Id.* at p. 1248.) The Court of Appeal affirmed, explaining that although "[i]t is undisputed the County never formally terminated Phillips nor did the sheriff formally remove him from active duty" (*id.* at p. 1254), section 31725 applies to more than the narrow situation in which employment has been "expressly terminated by the employer" (*Phillips*, at p. 1255).

Both Stephens and the Court of Appeal below mischaracterize the holding in *Phillips* and thus overstate its importance. The appellate court below opined that *Phillips* held an employee may be "effectively dismissed" within the meaning of section 31725 if the employee voluntarily places himself or herself on disability leave. Stephens similarly asserts that "*Phillips* expanded the application of § 31725 to situations where the employee had initially voluntarily left work rather than to only situations where the employer had initiated the action to take the employee off work." But the holding in *Phillips* is not so broad.

In affirming the trial court's ruling, the *Phillips* court signified it agreed the employee was entitled to reinstatement *as of the date he sought reinstatement*, as the trial court held, not as of the date he voluntarily took a medical leave without pay. In other words, when Phillips requested and was granted a leave of absence, he neither quit nor was he dismissed; the county merely allowed him to absent himself from work. Although, at his request, his absence was without pay, the agreement between himself and the county, characterized as a "leave," reflected a mutual understanding that he intended, and would be allowed, to return. It was when the county denied Phillips's request to return to his job that it acted in a way that severed the employment relationship. *Phillips* does not hold that an employee's voluntary decision to take leave time is the equivalent under section 31725 of being dismissed for disability. It holds only that a failure to *reinstate* an employee, following a period of permissive, voluntary leave, can constitute a "dismissal" despite the absence of a formal termination or firing.

Thus understood, *Phillips* has no application to the instant case. Whereas in *Phillips* the employee sought to return to his job after a period of voluntary medical leave and claimed he was "dismissed" as of the day his employer refused to reinstate him, Stephens never sought to return to his job between 1997 and 2003, but claims he was "dismissed" as of the day following his receipt of Captain Perryman's September 12, 1997, letter. Because the county never refused to reinstate Stephens, but simply told him to take sick leave until his medical condition allowed him to perform the modified light duty recommended by his physician, *Phillips* is not inconsistent with our conclusion that the county never dismissed Stephens within the meaning of section 31725.

To the extent Stephens claims two forms sent to him by AIGCS, Inc., the workers' compensation claims administrator for the County of Tulare, effected his dismissal, we reject that claim as well. At the threshold, that Stephens preserved this claim for appeal by raising it in the trial court is not clear. Although he mentions the two insurance forms in his trial court pleadings, the thrust of his argument was focused on the September 12, 1997, letter from Captain Perryman. Nevertheless, assuming for argument the claim is properly before us, we reject it. Stephens maintains he was dismissed by two AIGCS forms he received; each had a box checked next to a statement indicating the county "[d]oes not have a job available within your work restrictions." That an insurance company can serve as proxy for the employer, such that a simple checked box can "dismiss" an employee within the meaning of section 31725, seems doubtful. In any event, the trial court ruled a position had always been available for Stephens were he willing to return to work in the central control room and implicitly found Stephens understood that, notwithstanding the AIGCS forms. Substantial evidence supports the trial court's conclusion: Stephens's assignment to the central control room involved the same physical requirements as his modified light duty in the housing unit control room, those duties did not change and, when he returned to the job in 2003, he operated under the exact same medical restrictions. Stephens presented no evidence that, despite these facts, he nevertheless believed he had been dismissed by the two AIGCS forms. The record thus supports the trial court's ruling that the county in fact had a position available that accommodated Stephens's then documented medical restrictions.

In sum, although the phrase "dismissed . . . for disability," as used in section 31725, has been interpreted to encompass employer actions that are functionally equivalent to terminating an employee, Stephens cites no authority, and we have found none, holding that an employer functionally or effectively terminates an employee by telling the employee to go out on sick leave until his or her medical condition abates sufficiently to enable return to the job. As the court said in *Alvarez-Gasparin v. County of San Bernardino*, *supra*, 106 Cal.App.4th at page 188: "There is simply no showing that plaintiff was dismissed, expressly or impliedly." Accordingly, we agree with the trial court that Captain Perryman's September 12, 1997, letter did not dismiss Stephens from his employment and that the protections of section 31725 were never triggered.

## CONCLUSION

The decision of the Court of Appeal is reversed, and the matter is remanded to that court with directions to affirm the trial court's decision denying the petition for writ of mandate.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.