[No. B176552. Second Dist., Div. Seven. July 26, 2006.]

CONSTA KELLY, Plaintiff and Respondent, v.
COUNTY OF LOS ANGELES, Defendant and Appellant.

912

## COUNSEL

Law Offices of Hausman & Sosa, Jeffrey M. Hausman and Larry D. Stratton for Defendant and Appellant.

Law Offices of Steven R. Pingel, Steven R. Pingel and Larry J. Roberts for Plaintiff and Respondent.

**OPINION**

**PERLUSS, P. J.**—Recognizing a local government employer might dismiss an employee after determining the employee is incapacitated and unable to perform his or her job duties or those of an alternative position only to have the county retirement board subsequently conclude the employee is not entitled to a disability retirement, the Legislature in 1970 amended the County Employees Retirement Law of 1937 (Gov. Code, § 31450 et seq.)[1] to add language designed to protect the affected employee. In addition to confirming the role of the county retirement board as the final arbiter of permanent incapacity for the performance of job duties, section 31725 provides, when a county employee is dismissed from his or her employment for permanent disability and the employee's application to the local retirement board for a service-connected disability retirement is thereafter denied on the ground he or she is not permanently disabled, the employer must, following the finality of the retirement board's decision, reinstate the employee retroactive to the date of dismissal and provide backpay and other benefits that would have otherwise accrued during the dismissal period.

In *Stephens v. County of Tulare* (2006) 38 Cal.4th 793 [43 Cal.Rptr.3d 302, 134 P.3d 288] (*Stephens*), decided in late May 2006, the Supreme Court addressed the meaning of the term "dismissed" as used in section 31725. This case requires us to apply the principles articulated in *Stephens* to a different factual setting to determine whether a county employee has been dismissed within the meaning of section 31725 when her local government employer (1) advises her it currently has no available position to accommodate her work restrictions imposed following her industrial injury, (2) places the employee on unpaid industrial-injury leave, but (3) offers the employee vocational rehabilitation (including a vocational rehabilitation maintenance allowance) to train the employee for another position. The answer under *Stephens* is no: Unless the employer evinces an intent to sever the employment relationship, the employee has not been dismissed for disability within the meaning of section 31725. Because there is no evidence of such an intent in this case, the county employee has no right under section 31725 to reinstatement with backpay following the retirement board's final decision denying her application for a service-connected disability retirement.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Kelly's Employment with the County of Los Angeles*

Consta Kelly began working as a licensed vocational nurse (LVN) for the Rancho Los Amigos Medical Center (RLAMC), a Los Angeles County

---

[1] Statutory references are to the Government Code unless otherwise indicated.

hospital, in 1979 and concurrently became a member of the Los Angeles County Employees Retirement Association (LACERA). At some point during the 1980's she was promoted from LVN I to LVN II. In 1990 she was struck by a combative patient and suffered injuries to both shoulders. Kelly received workers' compensation benefits for her shoulder injuries and continued to suffer some pain, but was able to return to her LVN II position.

### 2. *Kelly's 1991 Injury and Modified Assignment*

In 1991 Kelly injured her lower back helping a patient into a wheelchair. Kelly received workers' compensation benefits in connection with that injury and remained out of work for nearly one year. Kelly returned to work at RLAMC in 1992 with work restrictions from her physician that limited her ability to perform various duties ordinarily assigned to LVN's. To accommodate her work restrictions, RLAMC assigned Kelly to a data entry position, allowing her to retain her LVN II title and LVN II salary.[2]

### 3. *Kelly's 1994 Injury and Temporary Work Restrictions*

In 1994 Kelly experienced pain in her wrists and was diagnosed with chronic de Quervain's tenosynovitis. In 1995 she underwent separate surgeries on her right and left wrists and was on medical leave for several months. In November 1995 Kelly was released by her physician to return to work with work restrictions that precluded her from engaging in activities that required "repetitive gripping and grasping, the use of pounding and vibrating tools, and data entry." In addition, because of her prior back and shoulder injuries, she was precluded from engaging in activities that required "heavy lifting [and] repeated bending [and] stooping . . . ." Her physician found all of her disabilities to be "permanent and stationary" and recommended she be considered a "qualified injured worker" and vocationally rehabilitated to suitable employment.

### 4. *The March 18, 1996 Letter*

On March 18, 1996, RLAMC notified Kelly in writing that "[t]emporary work restrictions have been issued because of the industrial injury you sustained on June 15, 1991.[3] The objective of the work restriction is to prohibit any aggravation of the present disability, reinjury or to prevent a

---

[2] Kelly was assigned to the data entry position as part of a vocational rehabilitation plan, agreed to and signed by both Kelly and RLAMC's return-to-work coordinator.

[3] Although the letter referred to "temporary work restrictions," her physician's report stated and the testimony of RLAMC's nurse manager was that RLAMC had been advised by Kelly's physician prior to March 18, 1996, that her condition had become both permanent and stationary.

hazard to other employees. You should comply with these restrictions on all your assignments." After detailing the work restrictions imposed by Kelly's examining physician, the letter continued, "Your temporary work restrictions are not compatible with your current modified temporary assignment as a Licensed Vocational Nurse. Therefore, effective March 18, 1996 we will beg[i]n to code your time card as 'Industrial Accident.'" The letter advised Kelly to contact RLAMC concerning vocational rehabilitation and to ask any questions she may have concerning the letter. Kelly apparently did not inquire with anyone at RLAMC as to the meaning of the letter. According to her testimony, she did not believe the letter was a notice of termination or that she had otherwise been fired.

### 5. *RLAMC's Vocational Rehabilitation Plan for Kelly*

Kelly accepted RLAMC's offer of vocational rehabilitation, which RLAMC extended to Kelly pursuant to Labor Code section 139.5.[4] After meeting with RLAMC and reaching an agreement as to her vocational rehabilitation objective, in July 1996 Kelly began a vocational rehabilitation program at the Nova Institute for training as a medical laboratory technician and phlebotomist. RLAMC paid for the rehabilitation and provided Kelly with a maintenance allowance of $360 per week to assist her while she participated in the program in accordance with Labor Code section 139.5. According to the written vocational rehabilitation plan, signed by both Kelly and RLAMC's representative, Kelly agreed to attend the Nova Institute for training from July 8, 1996, through December 20, 1996. After Kelly had successfully completed the training, she was to be provided with eight weeks of placement services (ending February 14, 1997) and monitored "on the job" for 30 days to ensure "a successful return to suitable gainful employment." The plan was silent as to whether the objective was to retrain Kelly for placement in another position with Los Angeles County or in private employment. RLAMC's return-to-work coordinator testified it is RLAMC's practice to place an employee who successfully completes vocational rehabilitation first at RLAMC if a position is available and, if not, in another appropriate position with Los Angeles County.

### 6. *RLAMC's Stipulation Before the Workers' Compensation Appeals Board*

In November 1996, during Kelly's vocational rehabilitation training period, Los Angeles County and Kelly stipulated the injuries to Kelly's shoulders,

---

[4] Labor Code section 139.5 requires a county employer to provide vocational rehabilitation for qualified injured workers if the employee requests it and authorizes payment of a vocational rehabilitation maintenance allowance for up to 52 weeks to an employee who is participating in a vocational rehabilitation program and whose condition has become "permanent and stationary."

back and wrists occurred during the course of her employment and that she was 46 percent permanently disabled. The Workers' Compensation Appeals Board (WCAB) thereafter approved the stipulation and awarded her permanent disability indemnity benefits in the amount of $148 a week for 216.75 weeks.[5]

### 7. *Completion of Kelly's Vocational Rehabilitation Plan*

In December 1996 Kelly completed her vocational rehabilitation training and received certificates in phlebotomy and EKG (electrocardiogram) techniques. Pursuant to the vocational rehabilitation plan, she was provided with eight weeks of placement services, including job-seeking skills; she sent out 17 resumes as part of her course work. On her own initiative (separate from her required course work) Kelly called the laboratory department at RLAMC to inquire whether there were any openings for a phlebotomist. According to Kelly, the unidentified person answering the telephone in the laboratory told her the department had no openings at that time. Apart from those minimal efforts, Kelly did not contact the nurse manager or the return-to-work coordinator at RLAMC to inquire about reassignment to a county position, nor did she make any effort to solicit outside employment.

### 8. *Kelly's June 1998 Application for Disability Retirement*

In June 1998 Kelly filed with LACERA a request for a service-connected disability retirement, asserting she was permanently disabled and could no longer perform her position as an LVN II. In her written application submitted to LACERA under penalty of perjury, Kelly stated she had been on "industrial leave with compensation" ending in July 1997. She did not check the box on the application indicating she had resigned or had been terminated from her employment.[6]

### 9. *LACERA's Denial of Kelly's Application; Kelly's Administrative Appeal*

On March 5, 1999, LACERA's retirement board denied Kelly's application for a service-connected disability retirement, concluding she was able to

---

[5] Although only the stipulation before the WCAB is included in the record, Kelly and Los Angeles County agree the workers' compensation administrative law judge signed the stipulation, which was thereafter reduced to a judgment.

[6] Asked on the application to explain any delay in filing for disability retirement once informed of the permanency of her disability, Kelly stated she had "file[d] an application in October 1997." Other than that cryptic assertion in her application to LACERA, there is no explanation in the record why Kelly waited until June 1998 to apply for a service-connected disability retirement nor is there any indication Kelly actually filed an application with LACERA in October 1997.

substantially perform the duties of the LVN II position. The board based its decision on, among other things, the opinion of one of its panel physicians, who concluded after examining Kelly that she had attempted to deceive him during her examination and that there was no evidence of substantial impairment.[7]

On March 22, 1999, Kelly filed an administrative appeal of the retirement board's decision and requested a full evidentiary hearing. The evidentiary hearing took place on May 25, 2000. On October 30, 2001, LACERA's referee issued a proposed decision rejecting Kelly's application for a service-connected disability retirement, concluding there was no objective basis to find she was permanently disabled. According to the decision, Kelly could substantially perform the duties of an LVN II and had not been truthful with her medical examiners, electing to exaggerate her injuries and intentionally mislead her physicians as to her physical limitations.

10. *Kelly's and Los Angeles County's Petitions for Writ of Mandate Seeking to Compel LACERA to Find Kelly Permanently Disabled*

Both Kelly and Los Angeles County filed petitions for writ of mandate in the trial court pursuant to Code of Civil Procedure section 1085 seeking to compel LACERA to reverse its ruling and find Kelly eligible for a disability retirement. After a full hearing and examination of the administrative record, on July 21, 2003, the court denied both petitions for writ of mandate and entered judgment to that effect. Neither Kelly nor Los Angeles County appealed from the judgment.

11. *Kelly's Instant Petition for Writ of Mandate Seeking Retroactive Reinstatement with Backpay and Benefits*

On September 10, 2003, Kelly filed the instant petition for writ of mandate, this time seeking reinstatement, backpay and benefits as of March 19, 1996, the day after she was notified in writing that her current assignment was incompatible with her temporary work restrictions and that she would be placed on industrial leave. Kelly argued that, pursuant to section 31725, Los

---

[7] The panel physician reported, "It is totally unreasonable that no strength whatsoever was able to be generated with the right upper extremity, and on a total of three attempts with the left upper extremity, a total of two pounds was generated. If this were, in fact, the case, then Ms. Kelly would not even have the ability to handle any items, such as a can of Coke or a drink within a supermarket or in her own home. There is no logical rationale for these measurement findings, except that Ms. Kelly was attempting to intentionally deceive this examiner. . . . I do not find objective basis for any substantial level of disability."

Angeles County was required to reinstate Kelly to her LVN II position following LACERA's denial of her application for a service-connected disability retirement and to award her full backpay from March 19, 1996.

In December 2003, while the petition was pending, Los Angeles County informed Kelly it had found an LVN II position that could accommodate her work restrictions and she could return to that position retroactively, effective July 21, 2003, the date the trial court denied the petitions to reverse LACERA's decision. Los Angeles County argued its action had mooted Kelly's instant petition for a writ of mandate. Kelly disagreed, contending she was entitled not only to reinstatement, but also to backpay and benefits from March 19, 1996, through July 20, 2003. On May 5, 2004, the trial court agreed with Kelly and granted her petition for writ of mandate, concluding she was "effectively dismissed" from her employment on March 18, 1996, when she was notified by letter that she had been placed on "industrial-accident leave." The court directed Los Angeles County to provide Kelly with backpay as of March 19, 1996, through July 20, 2003, less the industrial-accident payments and vocational rehabilitation allowance she received during that period.

## CONTENTIONS

Los Angeles County contends the trial court erred in concluding Kelly was "effectively dismissed" from her employment as of March 18, 1996. It asserts Kelly was never dismissed and thus section 31725's protections for county employees dismissed due to disability and later denied a service-connected disability retirement are inapplicable.

## DISCUSSION

### 1. *Standard of Review*

A traditional writ of mandate lies "to compel the performance of an act which the law specifically enjoins, as a duty resulting from an office, trust, or station, or to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded . . . ." (Code Civ. Proc., § 1085, subd. (a); see also *Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 539–540 [28 Cal.Rptr.2d 617, 869 P.2d 1142].) In reviewing the trial court's ruling on a writ of mandate under Code of Civil Procedure section 1085, the Court of Appeal ordinarily determines whether the court's factual findings are

supported by substantial evidence. (*Caloca v. County of San Diego* (1999) 72 Cal.App.4th 1209, 1217 [85 Cal.Rptr.2d 660].) However, when, as here, the question involves the trial court's interpretation of a statute and the legal meaning of a written instrument on undisputed evidence, the question is one of law, subject to de novo review. (*Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965, 973–974 [97 Cal.Rptr.2d 280].)

### 2. *Section 31725*

Section 31725, part of the County Employees Retirement Law of 1937, provides, "Permanent incapacity for the performance of duty shall in all cases be determined by the board.[8] [¶] If the medical examination and other available information do not show to the satisfaction of the board that the member[9] is incapacitated physically or mentally for the performance of his duties in the service and the member's application [for a disability retirement] is denied on this ground the board shall give notice of such denial to the employer. The employer may obtain judicial review of such action of the board by filing a petition for a writ of mandate in accordance with the Code of Civil Procedure or by joining or intervening in such action filed by the member within 30 days of the mailing of such notice. If such petition is not filed or the court enters judgment denying the writ, whether on the petition of the employer or the member, and the employer has dismissed the member for disability the employer shall reinstate the member to his employment effective as of the day following the effective date of the dismissal."

In other words, if the local retirement board denies an employee-member's request for a service-connected disability retirement on the ground the employee is not permanently disabled and that decision has become final, the employee is entitled to reinstatement to his or her former position if he or she was dismissed on the ground of permanent disability. (*Stephens, supra*, 38 Cal.4th at p. 801.) Where applicable, section 31725 requires reinstatement be retroactive to the day following the effective date of the dismissal and to include payment of back wages and benefits that would have otherwise accrued during the dismissal period. (*Stephens,* at p. 801; *Leili v. County of Los Angeles* (1983) 148 Cal.App.3d 985, 988 [196 Cal.Rptr. 427] (*Leili*).)

In requiring reinstatement with backpay following a determination by the local retirement board that the employee is not permanently disabled, section 31725 represents a legislative effort to address the problem that arises when an employee is caught between inconsistent decisions of the employer and the retirement association on the question of disability and left with

---

[8] The "board" refers to the county board of retirement. (§ 31459, subd. (c).)

[9] "Member" refers to a member of the local county retirement association. (§ 31470.)

neither employment nor disability income. (*Stephens, supra,* 38 Cal.4th at p. 805.) Section 31725 "solve[s] this problem by giving the retirement board the final word on whether an employee [i]s disabled and providing that dismissed employees must be reinstated if the board f[inds] they [ar]e not disabled, while also giving local governments the right to take a judicial appeal of the board's decision. In this way, the Legislature [has] ensured that county employees dismissed for disability w[ill] have either employment or disability income and not be left destitute." (*Stephens,* at p. 805; see also *Leili, supra,* 148 Cal.App.3d at pp. 988–989 [purpose of § 31725 is to resolve problem of employees being caught between inconsistent decisions of retirement board and local government employer]; *Alvarez-Gasparin v. County of San Bernadino* (2003) 106 Cal.App.4th 183, 188 [130 Cal.Rptr.2d 750] [under § 31725 employee cannot be denied both employment on ground of disability and also denied disability retirement on ground employee is not permanently disabled].)

3. *The Stephens Decision and the Meaning of "Dismissed" in Section 31725*

The dispute in the instant case turns on the meaning of the term "dismissed" in section 31725. Kelly contends she was dismissed as soon as she was informed in the March 18, 1996 letter that her "temporary work restrictions" were incompatible with her current modified assignment as an LVN II. Los Angeles County, on the other hand, insists the March 18, 1996 letter did not constitute, either expressly or impliedly, a termination of Kelly's employment. The letter merely stated RLAMC had no ability to accommodate Kelly's temporary work restrictions at that time and that, as a result, Kelly would be placed on industrial-accident leave until the county found a position or until her disability abated and she could return to work. It also offered her the option of training for a different position, an offer that necessarily included payment to Kelly of a vocational rehabilitation maintenance allowance during the training period.

The Supreme Court's recent decision in *Stephens, supra,* 38 Cal.4th 793,[10] in which the court interpreted the term "dismissed" in section 31725, provides the governing principles for resolution of this case. The plaintiff John Stephens was employed by the Tulare County Sheriff-Coroner as a detention specialist III. After he injured his thumb during work, he was given modified light duty to accommodate his temporary work restrictions. Still, Stephens continued to complain of pain and threatened litigation unless he was given a different light-duty assignment. Thereafter, his county employer

---

[10] *Stephens, supra,* 38 Cal.4th 793, was decided after the parties filed their appellate briefs in this matter. Pursuant to our invitation, both the county and Kelly have filed supplemental letter briefs addressing *Stephens, supra,* 38 Cal.4th 793, and its impact on the issue in this case.

sent him a letter, dated September 12, 1997, stating in part, " 'Because of your statements we believe that we will not be able to provide a modified work assignment at this time. This letter is to confirm to you that you are not to return to work until further notice. At such time as your condition improves and you are able to return to work with no restrictions, or improves to the point that you are able to perform the "light duty" tasks required . . . without further complaint or injury, you will be expected to submit time sheets reflecting OFF DUTY/SICK/PERSONAL. I understand you have an open job injury claim for this problem ([Lab. Code, § ] 4850) that has yet to be resolved. Until notified by Worker's Compensation we will expect your time sheets to reflect use of your personal sick leave.' " (38 Cal.4th at p. 798.)

From September 12, 1997, to December 19, 1998, Stephens received full pay from Tulare County, initially in the form of sick and personal leave and, when that ceased, in the form of Labor Code section 4850 benefits (entitling a law enforcement officer who is injured on the job to a leave of absence without loss of salary for up to one year in lieu of disability payments or maintenance allowance payments). On November 18, 1998, Stephens applied for disability retirement with the Tulare County Employees' Retirement Association. The retirement board denied his application, and in 2002 the trial court denied his petition for a writ of mandate. In December 2002 Tulare County sent him a letter explaining that, since the retirement board had found him not permanently incapacitated and able to work, Tulare County was prepared to reinstate him and that, if he did not respond, Tulare County would assume he was not interested in returning to work. (*Stephens, supra,* 38 Cal.4th at pp. 799–800.)

On May 23, 2003, Stephens filed a petition for writ of mandate in the trial court seeking reinstatement and payment of back wages and benefits retroactive to September 13, 1997, contending he was "dismissed for disability" on September 12, 1997, the day he was sent the letter advising him not to return to his position. The trial court denied the petition, concluding the September 1997 letter contemplated that Stephens was still an active county employee utilizing leave time and did not advise Stephens, expressly or impliedly, that he had been terminated. (*Stephens, supra,* 38 Cal.4th at p. 800.)

The Fifth District Court of Appeal reversed the trial court's decision, concluding Stephens was "effectively dismissed" as soon as he was taken off active duty and told not to return until his temporary disability had abated. (See *Stephens, supra,* 38 Cal.4th at p. 806.) Citing numerous courts of appeal opinions, the Fifth District Court of Appeal reasoned, " ' "[D]ismissed" [in the context of section 31725] does not mean the same thing as "terminated" or "fired." An employee may be effectively dismissed if the county simply takes

him off active duty (*Leili*[, *supra*, 148 Cal.App.3d 985 [196 Cal.Rptr. 427]]) or the employee voluntarily places himself or herself on a disability leave (*Hanna* [*v. Los Angeles County Sheriff's Dept.* (2002) 102 Cal.App.4th 887 [125 Cal.Rptr.2d 686]]; *Tapia* [*v. County of San Bernardino* (1994) 29 Cal.App.4th 375 [34 Cal.Rptr.2d 431]]; *Phillips* [*v. County of Fresno* (1990) 225 Cal.App.3d 1240 [277 Cal.Rptr. 531]]). This is so even if the employee eventually returns to work because the disability is temporary (*Raygoza* [*v. County of Los Angeles* (1993) 17 Cal.App.4th 1240 [21 Cal.Rptr.2d 896]]; *Phillips*), because the employee has been retrained or rehabilitated, or because the employer is able to make the appropriate accommodations. Moreover, an out-of-work employee is no less "dismissed" because the county has no position available compatible with the employee's work restrictions (*Hanna, Tapia, Raygoza, Phillips*), or even because the employee is, or appears to be, disabled notwithstanding the retirement board's contrary conclusion (*Raygoza, Phillips*). In short, the fact Stephens was never formally terminated is immaterial to our analysis.' " (*Stephens, supra,* 38 Cal.4th at p. 806, italics omitted.)

 The Supreme Court reversed the decision of the Fifth District Court of Appeal, concluding the court had applied too "expansive" a definition of the term "dismissal" and had overstated the limited holdings of the appellate court decisions it cited. (*Stephens, supra,* 38 Cal.4th at p. 806.) The court explained the plain meaning of the term "dismissed" in the employment context is, in fact, synonymous with the terms "terminated" or "fired." The dismissal of an employee contemplates a severance of the employment relationship at the employer's election. (*Id.* at p. 802.) It presupposes the employer no longer has an obligation to pay salary or other forms of compensation and the employee has no basis for expectation that a position exists, will be kept open or will be made available upon the employee's offer to return to work. (*Ibid.*)

An employee's temporary separation from work during a period of temporary disability, when both the employer and the employee contemplate a return to work after the temporary disability abates, is not a "dismissal" under section 31725, which is concerned only with the consequences of permanent disability. (*Stephens, supra,* 38 Cal.4th at p. 802 [§ 31725 addresses "permanent, not merely temporary, absence from employment" on account of permanent disability].) Moreover, an employee who "voluntarily absents himself or herself from the job" by taking unpaid medical leave, for example, cannot validly claim he or she was dismissed by the employer. (*Id.* at p. 802.) To the extent the employee remains uncertain of the existence of an employment relationship, it is the employee's obligation "to seek clarification." (*Ibid.*)

In upholding the trial court's conclusion that Stephens had not been terminated, either expressly or impliedly, the court observed the September 1997 letter directed Stephens to leave work temporarily until his medical condition improved and to report his absence on his timesheets to reflect that he was either off duty or taking sick or personal leave. " 'At no time was Mr. Stephens advised in [the September 1997] letter that he was dismissed from employment.' " (*Stephens, supra,* 38 Cal.4th at p. 803.) Moreover, during his absence, Stephens continued to be compensated, first by use of his sick leave and then by resort to his Labor Code section 4850 benefits. Thus, Stephens did not "face the financial dilemma" suffered by employees caught between inconsistent determinations of their employer and the retirement board and thus did not fall into the class of persons that section 31725's reinstatement requirement was intended to protect. (38 Cal.4th at pp. 804–806.) The court also found telling Stephens's testimony that he did not believe, after receiving the letter, that he had been terminated. (*Id.* at p. 803.) Finally, the court found substantial evidence supported the trial court's determination the modified light-duty position was consistent with Stephens's temporary work restrictions and that, far from being terminated, Stephens could have returned to that position at any time. (*Id.* at p. 804.)

4. *Kelly Was Not Dismissed from Her Employment on March 18, 1996*

Kelly contends she was dismissed from her county employment on March 18, 1996, because of her permanent disability. She attempts to distinguish *Stephens, supra,* 38 Cal.4th 793, asserting that, unlike the plaintiff in *Stephens,* Kelly was not given the option of returning to work in a modified light-duty position that accommodated her work restrictions, nor was she told she would continue to be paid using sick leave or other compensated leave time. (In pressing this purported distinction, of course, Kelly disregards the $340 per week she received as a vocational rehabilitation maintenance allowance, as well as the $140 per week she received in permanent disability indemnity benefits.) To the contrary, in the March 18, 1996 letter she was told her work restrictions were incompatible with her LVN II assignment and she had been removed from the regular payroll.

In asserting she was "effectively dismissed," Kelly (like the trial court in this case) relies in large measure on *Leili, supra,* 148 Cal.App.3d at pages 987 to 989. In *Leili,* a firefighter injured on the job received a letter from his government employer informing him his work restrictions were "incompatible with the arduous duties of his job" and his options were to seek a revision of the work restriction, file for disability retirement or request vocational rehabilitation. When his application for disability retirement was denied, he sought reinstatement and backpay pursuant to section 31725.

Division Four of the Second District Court of Appeal held section 31725 required the government to retroactively reinstate the firefighter with full backpay as of the date he was taken off active duty. (148 Cal.App.3d at p. 989.)

█ As the Supreme Court observed in *Stephens,* however, *Leili, supra,* 148 Cal.App.3d 985, did not directly address the meaning of the word "dismissed" in the context of section 31725 but rather assumed the employee, in fact, had been dismissed. (*Stephens, supra,* 38 Cal.3d at p. 807.) Thus, all that may be gleaned from *Leili* on this issue is the general principle that "no *formal* dismissal from the job is necessary in order to activate section 31725's protections; an employer's action that has the same effect will do." (*Ibid.*) Still, according to Kelly, that principle is directly applicable here. Although RLAMC did not serve Kelly with a formal termination notice, its action of sending her the March 18, 1996 letter informing her it was unable to accommodate her temporary work restrictions and removing her from the regular payroll was, as in *Leili,* the functional equivalent of a termination.

█ Although Kelly correctly observes that the March 18, 1996 letter, fairly interpreted, advised Kelly that RLAMC had no available position to accommodate her *"temporary* work restrictions," the letter on its face did not indicate that RLAMC viewed those restrictions as permanent. (See *Stephens, supra,* 38 Cal.4th at p. 802 [§ 31725 addresses dismissal for permanent, not temporary disability].) Nor is a dismissal established merely by the fact that Kelly was taken off the regular payroll. As the Supreme Court has made clear, the term "dismissed" does not simply mean the absence of a salary. A person could be on unpaid leave, perhaps as a reasonable accommodation under the Fair Employment and Housing Act for a significant period of time, but that alone is not sufficient to find a termination. (38 Cal.4th at p. 802.)

Nevertheless, assuming RLAMC viewed Kelly's work restrictions as permanent,[11] if RLAMC had informed Kelly of its inability to accommodate her permanent work restrictions and left it at that, without any indication of alternative employment, Kelly would have a strong basis for asserting she had been functionally terminated on grounds of permanent disability. (See, e.g., *Leili, supra,* 148 Cal.App.3d at p. 988.) But that is not what happened. Although in the March 18, 1996 letter Los Angeles County advised Kelly it had no available position to accommodate her work restrictions, it offered her vocational rehabilitation for a different position, an option that the

---

[11] The stipulation before the WCAB reflects that Kelly's physician had found her permanent and stationary on November 1, 1995. Although there is reference in that stipulation to an agreed medical examiner's report of June 19, 1996, after the March 1996 letter, RLAMC's nurse manager stated Kelly was sent the March 1996 letter only after RLAMC had been advised her condition had become permanent and stationary.

county was statutorily required to extend to a qualified injured worker (Lab. Code, § 139.5; *Bussear v. Workers' Comp. Appeals Bd.* (1986) 181 Cal.App.3d 186, 189 [226 Cal.Rptr. 242] [statutory objective of vocational rehabilitation under Lab. Code, § 139.5 is to "get the injured worker from 'the bed to the job' by the provision of appropriate vocational training"]) and that Kelly voluntarily accepted. To be sure, the written vocational rehabilitation plan agreed to by RLAMC and Kelly is silent as to whether the plan's objective includes retraining Kelly for placement in a position with Los Angeles County. Nonetheless, the uncontradicted testimony of Karen Grays, RLAMC's return-to-work coordinator, was that RLAMC's practice is to attempt to place an employee who had completed vocational rehabilitation in a position at RLAMC or, if one is not available, in another, appropriate Los Angeles County department. It is inconceivable that the employer's offer of vocational rehabilitation (with a vocational rehabilitation maintenance allowance) pursuant to Labor Code section 139.5 under these circumstances constitutes, either expressly or impliedly, a severance of the employment relationship. (See *Alvarez-Gasparin v. County of San Bernardino, supra*, 106 Cal.App.4th at p. 188 [employer's letter to disabled employee referencing vocational rehabilitation does not suggest an intent to dismiss county employee but rather "appears to anticipate a different county job as one alternative"].)[12]

Kelly testified she did not believe she had been terminated after receiving the March 18, 1996 letter and reiterated that belief in her June 1998 retirement application. As we have explained, the record supports Kelly's own assessment on this issue. Had Kelly sought to be placed in a new position in phlebotomy following the successful completion of her vocational rehabilitation and had Los Angeles County then denied her request, she could make a credible case she had been effectively dismissed at that time. (See, e.g., *Phillips, supra*, 225 Cal.App.3d at p. 1245 [employee who affirmatively sought to return to his job after taking voluntarily medical leave was "dismissed" within the meaning of § 31725 not at the time he took the leave, but only after he returned from leave seeking to be reinstated to his former position]; accord, *Hanna v. Los Angeles County Sheriff's Department, supra*, 102 Cal.App.4th at p. 892; see also *Stephens, supra*, 38 Cal.4th at p. 808 [*Phillips* "holds only that a failure to *reinstate* an employee, following a period of permissive, voluntary leave, can constitute a 'dismissal' despite the absence of a formal termination or firing"].) But Kelly did not contact RLAMC's return-to-work coordinator or any other RLAMC administrator for

---

[12] It would have been good practice, and certainly would have eliminated any possibility of confusion, had the objective for placement in a Los Angeles County position following vocational rehabilitation been articulated in the written vocational rehabilitation plan.

a new placement following her completion of vocational rehabilitation services because, according to Kelly, she simply believed that there was no position available. As *Stephens* makes clear, however, it is the employee's obligation to seek clarification in the event he or she is uncertain as to the continuing existence of the employment relationship. (*Stephens*, at p. 802.) By her own admission, Kelly did not seek clarification.

Our conclusion Kelly was not dismissed effective March 18, 1996, is reinforced by the legislative purpose of section 31725. Section 31725's retroactive-reinstatement requirement is intended to act as a safety net for those employees who find themselves "in limbo, having neither employment nor disability income." (*Stephens, supra*, 38 Cal.4th at p. 805.) Kelly did not face this financial dilemma in March 1996 when she was given vocational rehabilitation and statutory compensation in the form of Labor Code section 139.5 benefits. (Cf. *Stephens, supra*, 38 Cal.4th at p. 799 [following cessation of his sick leave, plaintiff continued to receive compensation in the form of Lab. Code, § 4850 benefits].) She thus did not fall in the class of persons left without employment or disability income that section 31725 was intended to protect. (38 Cal.4th at p. 799.) To the extent Kelly lacked employment-related income following the cessation of her vocational rehabilitation benefits in July 1997, that was the product of her own inaction, rather than the result of a termination. Nothing prevented Kelly from returning to RLAMC following her completion of her vocational rehabilitation and requesting placement. (See *Stephens*, at p. 802 [employee who is "neither sent away nor removed, but voluntarily absents himself or herself from the job, without more, cannot validly claim he or she was 'dismissed' by the employer"].)[13] As we have explained, had Kelly requested placement following vocational rehabilitation and been denied employment with Los Angeles County, it would have been reasonable to conclude she had been functionally dismissed at that point.

■ In sum, the March 18, 1996 letter does not evince an intent to sever the employment relationship nor is such an intent reflected in any of the evidence in this case, all of which is generally undisputed. Accordingly, we reverse the trial court's determination, based on authority preceding the Supreme Court's decision in *Stephens, supra*, 38 Cal.4th 793, that Kelly was "effectively dismissed" when she received the March 18, 1996 letter.

---

[13] In light of our holding, we need not address Los Angeles County's argument that application of section 31725 under the circumstances of this case, in which the retirement board found Kelly was deliberately misrepresenting the extent of her disability, would lead to absurd results—the county would be required to reinstate Kelly and afford backpay and benefits while complying with work restrictions for a disability the retirement board has concluded is illusory. Nor do we address the county's alternative argument that Kelly failed to mitigate her income losses by waiting more than two years following the March 18, 1996 letter to seek a disability retirement.

## DISPOSITION

The judgment is reversed. The County of Los Angeles is to recover its costs on appeal.

Woods, J., and Zelon, J., concurred.