[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1471 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1472 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1473 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1474 
OPINION
Civil Code section 51.9[1] prohibits sexual harassment against a plaintiff by a person engaged in a designated "business, service, or professional relationship," including a trustee. (§ 51.9, subd. (a)(1)(C).) We hold that the interpretation definition of sexual harassment for purposes of section 51.9 is consistent with that applied under the California Fair Employment and Housing Act (FEHA; Gov. Code, §12900 et seq.) and title VII of the federal Civil Rights Act of 1964 (Title VII).
 Plaintiff in this action is Suzan Hughes, a former wife of Mark Hughes, [2] the founder of Herbalife, who died in 2000. Suzan sued defendant Christopher Pair, one of three trustees of Mark's estate, alleging sexual harassment under section 51.9 and intentional infliction of emotional distress. The trial court granted Pair's motion for summary judgment. We affirm the judgment.
 UNDISPUTED FACTS IN THE SUMMARY JUDGMENT MOTION[3] Suzan was Mark's third wife. They had a son, Alex, who was Mark's only child. Their marriage ended with a contentious dissolution and settlement in 1998. Mark died at the age of 44 in 2000, leaving an estate valued at $400 million. The estate was in the form of a trust. Alex was 14 years old at the time of this litigation.
 After the marital dissolution, Mark amended his trust to expressly exclude Suzan as a beneficiary, by adding language that the trust be "interpreted for all purposes as if Suzan had predeceased" Mark. Suzan has had a contentious and adversarial relationship with Pair for four years, marked by seven lawsuits by Suzan against the trust or the trustees, including unsuccessful attempts to remove the trustees. *Page 1475 
 On June 13, 2005, Suzan requested reimbursement from the trust for a two-month rental of a Malibu beach home for Alex at a cost of $80,000 per month. On June 16, 2005, the trustees unanimously approved the rental of the beach house, but only for a duration of one month. The trustees rejected the request for the two-month rental for the following reasons: there was insufficient information to justify the expense; vacation expenses were Suzan's responsibility under her marital settlement agreement with Mark; a portion of the vacation home expense should be allocated to Suzan or through guardianship funds under her control; and the two-month rental was for Suzan's benefit rather than Alex's.
 Notice of the trustees' decision was provided to Suzan's counsel in writing. Suzan was aware of this decision and of Pair's vote on the issue before June 27, 2005.
The June 27, 2005 Phone Call
 Suzan had not spoken to Pair for a period of approximately three years before receiving a telephone call from him on June 27, 2005. Pair invited Suzan and Alex to join him and his son that evening at a special presentation of the King Tut exhibit. During the call, Suzan protested the trustees' decision to only allow a one-month rental of the Malibu beach house. Pair commented that "you know how much I love Alex and you in that special way." While discussing the Malibu rental, Pair told Suzan he could be persuaded "to give more time if you would be nice to me." Suzan told Pair that "talking to me this way is crazy," to which Pair replied, "how crazy do you want to get?" Pair gave Suzan his home phone number and told her to call him if she changed her mind. Suzan wrote down Pair's phone number. She did not accept Pair's invitation to attend the King Tut exhibit.
The Incident at the King Tut Exhibit on the Evening of June 27, 2005
 Although Suzan did not accept Pair's invitation, she did attend the King Tut exhibit with her son that night. She saw Pair and his nine-year-old son in a hallway leading to the exhibit. The only thing Pair said to her was, "I'm going to get you on your knees and fuck you one way or another." This statement was made in close proximity to Pair's son and Alex. Pair said "hi," or words to that effect, to Alex before walking off. Suzan and Alex then went through the exhibit. The encounter between Suzan and Pair lasted only a few seconds.
The Impact of Pair's Statements on Suzan
 Suzan testified at her deposition that Pair's statements on June 27, 2005, caused her to suffer from discomfort, worry, anxiety, upset stomach, concern, *Page 1476 
and agitation in the form of her heart racing. She suffered from these symptoms in relation to other litigation involving the trust, but to a lesser degree. Pair's statements had no effect on her daily activities other than to cause her to miss a meeting to prepare for her deposition. When Suzan was asked at her deposition if she sought mental health counseling as a result of Pair's statements, Suzan's counsel responded that "This is the kind of emotional distress you go to a lawyer for, not a psychiatrist," and Suzan was "not making any claim for psychiatric, psychological help" in this action. Counsel stated he was instructing his client not to answer questions in that area.[4]
 PAIR'S MOTION FOR SUMMARY JUDGMENT Pair's motion for summary judgment raised multiple issues as to Suzan's cause of action for sexual harassment under section 51.9. As pertinent to this appeal, Pair argued: Suzan's relationship with Pair was not entitled to protection under section 51.9 because she was not a beneficiary of the trust; Suzan could not establish quid pro quo sexual harassment because she was not entitled to and did not suffer the loss of a tangible benefit from the trust; there was no causal connection between the harassing conduct and the trust's earlier decision to allow only a one-month rental of the Malibu beach house; and Suzan could not establish a hostile environment sexual harassment claim because his conduct was not pervasive or severe as a matter of law.
 As to the second cause of action for intentional infliction of emotional distress, Pair argued Suzan did not suffer severe, substantial, or enduring distress; she did not seek medical, psychiatric, or psychological treatment for her alleged emotional distress; Suzan should be estopped from pursuing this cause of action because counsel stipulated Suzan was not making a claim for psychiatric or psychological treatment; and Pair did not engage in outrageous conduct which exceeded all bounds usually tolerated by a decent society.
 In granting Pair's motion for summary judgment, the trial court ruled that sexual harassment, for purposes of section 51.9, must be defined in a fashion consistent with the well developed case law under the FEHA and Title VII. Suzan could not establish quid pro quo sexual harassment because Mark's trust expressly prohibited her from receiving any benefit under the trust, and in any event, the decision to grant a one-month beach rental rather than two months was unanimously made before the alleged harassing conduct. The undisputed facts established that Pair's comments to Suzan were not pervasive or severe. Because Suzan had no cause of action for sexual harassment, *Page 1477 
there was no outrageous conduct by Pair that would support a cause of action for intentional infliction of emotional distress. The undisputed evidence showed that Pair's comments did not affect Suzan's daily life and her counsel stipulated she sought no treatment of any kind for emotional distress. The injury Suzan suffered as a result of Pair's conduct was not substantial in quantity or enduring in quality.
 DISCUSSION I SUMMARY JUDGMENT WAS PROPERLY GRANTED ON THE SEXUAL HARASSMENT CAUSE OF ACTION UNDER SECTION 51.9 Suzan argues that as her son's mother and guardian, she had a sufficient relationship with Pair, as trustee over Mark's trust, to fall within the protections of section 51.9. Suzan also argues the relationships covered by section 51.9 do not involve the same considerations as the employer/employee relationship under the FEHA and Title VII, and as a result, the definitions of sexual harassment under the FEHA and Title VII should not be applied to actions under section 51.9. Specifically, Suzan argues the FEHA and Title VII definitions of "pervasive or severe" sexual harassment are not applicable under section 51.9. Suzan contends that because her action was brought against Pair, rather than against the trust, there is no issue as to whether the conduct was pervasive or severe enough to alter her relationship with the trust. Pair made unwelcome and severe sexual advances and demands which were linked to a future quid pro quo, which affected Suzan's interests. She suffered emotional distress as required by section 51.9 because physical injuries are not required by Alcorn v. Anbro Engineering, Inc.
(1970) 2 Cal.3d 493, 498 [86 Cal.Rptr. 88, 468 P.2d 216].
Standard of Review
 If the papers submitted by the parties show there is no triable issue as to any material fact, the "moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); see Aguilar v.Atlantic Richfield Co. (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841,24 P.3d 493] (Aguilar).) A cause of action has no merit if one or more elements of that cause of action cannot separately be established, or a defendant establishes an affirmative defense to that cause of action. (Code Civ. Proc., § 437c, subd. (o).) "If a party moving for summary judgment in any action . . . would prevail at trial without submission of any issue of material fact to a trier of fact for determination, then he should prevail on summary judgment. In such a *Page 1478 
case, . . . the `court should grant' the motion `and avoid a . . . trial' rendered `useless' by nonsuit or directed verdict or similar device. [Citations.]" (Aguilar, supra, 25 Cal.4th at p. 855.) It is sufficient for a defendant to show that the plaintiff does not possess, and cannot reasonably obtain, the evidence necessary to establish the elements of a cause of action. (Id. at pp. 854-855.)
 We review an order granting summary judgment de novo. (Saelzler v.Advanced Group 400 (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617,23 P.3d 1143]; Guz v. Bechtel National, Inc. (2000) 24 Cal.4th 317, 334
[100 Cal.Rptr.2d 352, 8 P.3d 1089].)
Section 51.9
 Finding that "`sexual harassment occurs not only in the workplace, but in relationships between providers of professional services and their clients'" (Historical and Statutory Notes, 6 West's Ann. Civ. Code (2007 ed.) foil. § 51.9, p. 565), the Legislature in 1994 enacted section 51.9.[5] Prior to the enactment of section 51.9, the FEHA (Gov. Code, § 12900 et seq.) prohibited *Page 1479 
sexual harassment in employment (id., § 12940, subd. (j)). As originally enacted in 1994, sexual harassment under section 51.9 was prohibited if the conduct was "persistent or severe."
 The elements of section 51.9 are as follows: there was a business, service, or professional relationship between the plaintiff and the defendant; the defendant made sexual advances, solicitations, sexual requests, or demands for sexual compliance to the plaintiff, or the defendant engaged in verbal, visual, or physical conduct of a sexual nature or a hostile nature based on gender; the conduct of the defendant was unwelcome and pervasive or severe; the plaintiff was unable to easily end the relationship with the defendant; and the plaintiff has suffered or will suffer economic loss or disadvantage or personal injury or the violation of a statutory or constitutional right as a result of the defendant's conduct. (See Judicial Council of Cal. Civ. Jury Instns. (2007) CACI No. 3024; BAJI No. 7.91.) Section 51.9 contains a noninclusive list of qualifying relationships "between a plaintiff and a person," including that of a trustee.
 As originally enacted in 1994, section 51.9 required that a defendant's conduct be "persistent or severe." The "persistent or severe" language of the original enactment was replaced in 1999 with a requirement that the offending comment be "pervasive or severe." The purpose of the 1999 amendment was to bring "the definition and standard of sexual harassment in . . . section 51.9 in compliance with FEHA and other employment and housing discrimination law." (Assem. Judiciary, Background Information on Assem. Bill No. 519 by Aroner (1999-2000 Reg. Sess.) as amended by ch. 964, p. 2.) "Specifically, the bill would provide that: [¶] . . . [¶] 2. The scope of actionable conduct must be `pervasive' rather than `persistent'." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 519 (1999-2000 Reg. Sess.) as amended Sept. 9, 1999, p. 2.) As recognized by the Legislature, the word "persistent" is not used in discrimination statutes or case law. "Instead, both state and federal decisions have uniformly required a showing that the harassment be `pervasive' but not necessarily of a `persistent' nature." (Id. at p. 4.) Assemblywoman Dion Louise Aroner's letter to Governor Davis, dated September 16, 1999, urging him to sign Assembly Bill No. 519 noted that the 1994 version of section 51.9 "inadvertently created sexual harassment standards that are unprecedented and inconsistent with other code sections, FEHA, Title VII (the Equal Employment Opportunity Act), Title VIII (the federal Fair Housing Act) and other case law." According to Assemblywoman Aroner, Assembly Bill No. 519 intended to address the "discrepant prerequisites that . . . section 51.9 establishes for a lawsuit that do not exist in any other area of discrimination law or regulation, though the injury is the same." (Assemblywoman Dion Louise Aroner, author of Assem. Bill No. 519, letter to Governor Davis, Sept. 16, 1999.) The Legislative Counsel's Digest of Assembly Bill No. 519 noted *Page 1480 
that the amendments to section 51.9 would require that the prohibited conduct be "pervasive" rather than "persistent."
 Although the 1999 amendment focused on the "persistent" conduct element of section 51.9, it is apparent that the Legislature intended that section 51.9 be applied in a fashion consistent with the FEHA and by implication, Title VII. As discussed more fully below, identical words in comparable statutes should be given the same interpretation, a principle which we apply to the "pervasive or severe" language found in section 51.9.
The Sufficiency of the Relationship for Purposes of Section 51.9
 Pair argues that because Suzan is not a beneficiary of the trust, and is in fact expressly prohibited from receiving any benefit, she is not entitled to the protection against sexual harassment provided by section 51.9. We conclude Pair's construction of the statute is too narrow and is inconsistent with the intent of the Legislature.
 In interpreting a statute, we follow the intent of the Legislature by first looking to the plain meaning of the provision. (Stephens v. Countyof Tulare (2006) 38 Cal.4th 793, 801 [43 Cal.Rptr.3d 302, 134 P.3d 288];Equilon Enterprises v. Consumer Cause, Inc. (2002) 29 Cal.4th 53, 59 [124 Cal.Rptr.2d 507, 52 P.3d 685].) If the plain language of the statute is clear and unambiguous, there is no need for judicial construction of the meaning of the statute. (Stephens v. County of Tulare, supra,38 Cal.4th at p. 801.) (3) The law is clear that the FEHA is to be liberally construed. (Gov. Code, § 12993, subd. (a); Richards v. CH2MHill, Inc. (2001) 26 Cal.4th 798, 819 [111 Cal.Rptr.2d 87, 29 P.3d 175].) Considering that section 51.9, like the FEHA, prohibits sexual harassment within defined relationships, we conclude section 51.9 is also entitled to liberal construction to effectuate its purposes.
 Although Suzan is not a beneficiary of the trust, her relationship with Pair falls within the Legislature's intended reach of section 51.9. Suzan is Alex's mother and guardian, and in those capacities, she must deal with the trust on Alex's behalf, even if she is not a beneficiary. The language of section 51.9 does not limit its scope to a relationship between a trustee and beneficiary. Instead, the statute is more expansive, applying to a relationship between "a plaintiff and a person, including . . . a trustee." (§ 51.9, subd. (a)(1)(C).) The statute also applies to any "relationship that is substantially similar" to those listed in section 51.9. (§ 51.9, subd. (a)(1)(F).) Suzan, acting on Alex's behalf as his mother and guardian, does not have an ability "to easily terminate the relationship" with Pair as a trustee. (§ 51.9, subd. (a)(3).) Suzan has a sufficient "business, service, or professional relationship" with Pair as a trustee to qualify her for protection from sexual harassment under section 51.9. *Page 1481 
Quid Pro Quo Sexual Harassment
 "The FEHA prohibits the sexual harassment of an employee. (Gov. Code, § 12940, subd. (j)(1).) Sexual harassment consists of any unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature. (Fisher v. San Pedro Peninsula Hospital
(1989) 214 Cal.App.3d 590, 607 [262 Cal.Rptr. 842] (Fisher).) It usually arises in two contexts. `Quid pro quo' harassment conditions an employee's continued enjoyment of job benefits on submission to the harassment. `Hostile work environment' harassment has the purpose or effect of either interfering with the work performance of an employee, or creating an intimidating workplace. (Weeks [v. Baker McKenzie (1998)]63 Cal.App.4th [1128,] 1146 [74 Cal.Rptr.2d 510].)" (Rieger v. Arnold
(2002) 104 Cal.App.4th 451, 459 [128 Cal.Rptr.2d 295].)
 The Supreme Court has explained the relevance of the terms quid pro quo and hostile work environment to Title VII litigation. "To the extent they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general, the terms are relevant when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII. When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII. For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive." (Burlington Industries, Inc. v. Ellerth
(1998) 524 U.S. 742, 753-754 [141 L.Ed.2d 633, 118 S.Ct. 2257].) However, when a "claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct." (Id. at p. 754; see also Miller v.Department of Corrections (2005) 36 Cal.4th 446, 461-462, fn. 6 [30 Cal.Rptr.3d 797, 115 P.3d 77] (Miller).)
 The undisputed evidence in this case reveals that Suzan cannot establish quid pro quo sexual harassment because Pair's statements did not alter their relationship in any way. No tangible action occurred as a result of Pair's conduct. The decision to deny a two-month rental of the beach house, in favor of a shorter rental, had been made prior to the time of Pair's phone call to Suzan and the incident at the King Tut exhibit. The relationship between Suzan and Pair, in his capacity as trustee, was not altered by his comments. To put it mildly, Suzan and Pair had a contentious relationship, as evidenced by the fact Suzan had not spoken with Pair for three years prior to the phone call on June 27, 2005, and she had filed seven petitions between 2000 and 2005 challenging the actions of the trustees and custodians involved in *Page 1482 
Mark's estate. Nothing changed as a result of Pair's comments to Suzan. Viewed in the light most favorable to Suzan, the undisputed evidence does not establish quid pro quo sexual harassment.
"Pervasive or Severe" Conduct Under Section 51.9
 Because there was no quid pro quo sexual harassment, Suzan can only prevail if Pair's conduct rose to the level of being "pervasive or severe." Suzan understandably does not contend that Pair's sexual harassment was pervasive, considering that the phone call and the incident at the King Tut exhibit occurred on the same day, and Suzan had otherwise not spoken to Pair for three years. She does argue, however, that Pair's conduct was severe and the trial court erred in looking to cases interpreting the FEHA and Title VII to determine the meaning of "severe" for purposes of a cause of action under section 51.9. Suzan argues that the FEHA and Title VII definitions of "severe" apply only in the employment context and those definitions have no relevance to the types of relationships protected from sexual harassment under section 51.9.
 The trial court correctly ruled that the words "pervasive or severe" have the same meaning under section 51.9 as they are given in the well-settled case law decided under the FEHA and Title VII. As discussed above, one of the express purposes of the 1999 amendments to section 51.9 was to bring the language of section 51.9 in line with other discrimination statutes, including the FEHA, in order to provide consistency to the statutes prohibiting sexual discrimination. "Identical language appearing in separate provisions dealing with the same subject matter should be accorded the same interpretation." (Walker v. SuperiorCourt (1988) 47 Cal.3d 112, 132 [253 Cal.Rptr. 1, 763 P.2d 852].) "Because the Legislature is deemed to have acted with knowledge of existing statutes and judicial decisions, when the Legislature enacts a statute with identical or substantially similar language to a statute on a related subject, there is a presumption the lawmakers intended the newer statute to have the same construction as that given to the earlier enacted and judicially construed statute." (People ex rel. Gwinn v.Kothari (2000) 83 Cal.App.4th 759, 769 [100 Cal.Rptr.2d 29].)
 It is true that the FEHA and Title VII prohibit discrimination in employment based upon sexual harassment. "With certain exceptions not implicated here, the FEHA makes it an unlawful employment practice for an employer, `because of the . . . sex . . . of any person, . . . to discriminate against the person in compensation or in terms, conditions, or privileges of employment.' ([Gov. Code,] § 12940, subd. (a).)" (Lylev. Warner Brothers Television Productions (2006) 38 Cal.4th 264, 277 [42 Cal.Rptr.3d 2, 132 P.3d 211] (Lyle).) Title VII is to the same effect to the extent it prohibits *Page 1483 
discrimination based upon sexual harassment in the workplace. "Thus, while the wording of Title VII and the FEHA differs in some particulars, both statutory schemes regard the prohibition against sexual harassment as part and parcel of the proscription against sexual discrimination, and `the antidiscriminatory objectives and overriding public policy purposes of the two acts are identical.' (Beyda v. City of Los Angeles (1998)65 Cal.App.4th 511, 517 [76 Cal.Rptr.2d 547].)" (Lyle, supra,38 Cal.4th at p. 278.) In light of these similarities, "California courts frequently seek guidance from Title VII decisions when interpreting the FEHA and its prohibitions against sexual harassment. (Miller, supra, 36 Cal.4th at p. 463.)" (Lyle, supra, 38 Cal.4th at p. 278.)
 Although section 51.9 on the one hand and the FEHA and Title VII on the other, are directed at prohibiting sexual harassment in different types of relationships, it does not follow that the words "pervasive or severe" take on different meanings depending upon which antidiscrimination statute is involved. In cases under the FEHA and Title VII, the issue is whether the sexually harassing conduct is severe enough to "create an abusive work environment." (Lyle, supra,38 Cal.4th at p. 279.) Under section 51.9, the issue is whether the sexually harassing conduct is pervasive or severe enough to cause a plaintiff to suffer "economic loss or disadvantage or personal injury, including, but not limited to, emotional distress or the violation of a statutory or constitutional right. . . ." (§ 51.9, subd. (a)(4).) Whether in the employment context under the FEHA and Title VII, or in the context of a statutorily recognized relationship under section 51.9, the ultimate issue of whether a defendant's conduct is pervasive or severe comes down to the same considerations. Accordingly, we find guidance in the case law decided under the FEHA and Title VII in determining if Pair's conduct was severe for purposes of section 51.9.
 Our colleagues in Division Seven explained the law defining "severe" conduct constituting sexual harassment under the FEHA and Title VII inHerberg v. California Institute of the Arts (2002) 101 Cal.App.4th 142,150-151 [124 Cal.Rptr.2d 1] (Herberg). In Herberg, a drawing depicting an 82-year-old administrative employee of an art school engaging in sexual activity with a nude male faculty member was put on display in the school's main gallery for 24 hours. The employee, her daughter, and granddaughter filed an action under the FEHA for sexual harassment.Herberg affirmed an order granting summary judgment on the ground the offending conduct, "although doubtless upsetting to the plaintiffs," was not sufficiently pervasive or severe to create a hostile work environment. (101 Cal.App.4th at p. 150.)
 In its survey of pertinent authority, Herberg recognized that a single incident generally is insufficient to establish a hostile work environment, *Page 1484 
citing Brooks v. City of San Mateo (9th Cir. 2000) 229 F.3d 917, 926
(summary judgment properly granted in favor of defendant where plaintiff's supervisor forced his hand under her sweater and bra to fondle her bare breast). "Although plaintiffs argue that `even a single incident of severe harassment may be sufficient' to establish liability by an employer for sexual harassment, a review of the cases they cite reveals that such a single incident must be severe in the extreme and generally must include either physical violence or the threat thereof." (Herberg,supra, 101 Cal.App.4th at p. 151.) Herberg also cited Department ofCorrections v. State Personnel Bd. (1997) 59 Cal.App.4th 131, 134,156 [69 Cal.Rptr.2d 34], which held that "hostile work environment liability may exist for a single incident of rape, but no such liability attached for single incident in which corrections officer used profane language and shook a female Hispanic fellow officer by her collar to emphasize his point." (Herberg, supra, 101 Cal.App.4th at p. 151.)
 "Indeed, other courts have found that even unwelcome sexual touching is insufficient to constitute severe or pervasive harassment when the incidents are isolated and there is no violence or threat of violence. (E.g., Candelore v. Clark County Sanitation Dist. (9th Cir. 1992)975 F.2d 588, 590 (per curiam) [affirming summary judgment for defendant where `isolated incidents of sexual horseplay alleged by Candelore took place over a period of years and were not so egregious as to render Candelore's work environment "hostile"']; Del Valle Fontanez v. Aponte
(D.P.R. 1987) 660 F.Supp. 145, 146-147, 149 [incident where defendant `pressed [plaintiff] against the door with his body' and plaintiff `felt defendant's erect sexual organ against her body' twice in a five-minute period was not severe or pervasive enough to create a hostile working environment]; Saxton v. American Tel. Tel. Co. (7th Cir. 1993) 10 F.3d 526, 528, 534 [affirming summary judgment in favor of defendant where plaintiff was rubbed and kissed on one occasion and resisted an attempted groping on another].)" (Herberg, supra,101 Cal.App.4th at p. 153.)
 The Supreme Court opinion in Clark County School Dist. v. Breeden
(2001) 532 U.S. 268 [149 L.Ed.2d 509, 121 S.Ct. 1508] (Breeden) is instructive. In Breeden, during a meeting between the plaintiff, her male supervisor, and another male employee to discuss four job applicants, the supervisor read aloud from a comment made by one of the applicants about a coworker indicating, "`I hear making love to you is like making love to the Grand Canyon.'" When the plaintiff said she did not know what the comment meant, the other male employee said, "`Well, I'll tell you later,' and both men chuckled." (Id. at p. 269.) The plaintiff alleged she complained about the comment, and was retaliated against for her complaint. Reversing the judgment of the Ninth Circuit Court of Appeals upholding the cause of action, the Supreme Court concluded "no one could reasonably believe that the incident recounted above violated Title VII." (Id. at p. 270.) Reiterating *Page 1485 
early decisions, the Supreme Court held that sexual harassment for purposes of Title VII is only actionable if the conduct is so severe or pervasive as to alter the conditions of employment and create an abusive work environment. (Ibid., citing Faragher v. Boca Raton (1998)524 U.S. 775, 786 [141 L.Ed.2d 662, 118 S.Ct. 2275].) Simple teasing, offhand comments, and isolated incidents that are not extremely serious are not sufficiently severe to violate Title VII. (Breeden, supra,532 U.S. at p. 271; Faragher v. Boca Raton, supra, 524 U.S. at p. 788.)
 As in Herberg, the nature of the alleged sexual harassment of Suzan by Pair "does not begin to approach the severity of rape or violent sexual assault or even milder forms of unwanted physical contact." (Herberg,supra, 101 Cal.App.4th at p. 153.) Suzan was not physically touched. The comments made by Pair in the telephone call were ambiguous and do not, in and of themselves, support a claim for sexual harassment. Although Suzan was disturbed and distressed by Pair's coarse and vulgar comments at the King Tut exhibit, his statement was an "`isolated inciden[t]' that cannot remotely be considered `extremely serious,'" as required by the Supreme Court. (Breeden, supra, 532 U.S. at p. 271.) To allow Suzan's action to proceed to trial would require an interpretation of the word "severe" that is inconsistent with its meaning under the FEHA and Title VII. This is not what the Legislature intended when it amended section 51.9 in 1999. We decline to depart from the interpretation of "severe" supported by state and federal authorities, as well as the clear expression of legislative intent. Although the conduct attributed to Pair was grossly inappropriate, it is simply not actionable under section 51.9.
 II INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS Suzan next argues summary judgment was improperly granted as to her cause of action for intentional infliction of emotional distress. We agree with the trial court that because Pair's conduct did not run afoul of section 51.9, the intentional infliction of emotional distress cause of action must also fail. Moreover, Suzan has established neither outrageous conduct nor the degree of extreme emotional distress necessary to maintain this cause of action.
 A cause of action for intentional infliction of emotional distress has three elements: (1) extreme and outrageous conduct by a defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) a plaintiffs suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by a *Page 1486 
defendant's outrageous conduct. (Christensen v. Superior Court (1991)54 Cal.3d 868, 903 [2 Cal.Rptr.2d 79, 820 P.2d 181]; Cochran v. Cochran
(1998) 65 Cal.App.4th 488, 494 [76 Cal.Rptr.2d 540].) Conduct is extreme and outrageous when it exceeds all bounds of decency usually tolerated by a decent society and is of a nature which is especially calculated to cause, and does cause, mental distress. (Cochran v.Cochran, supra, 65 Cal.App.4th at p. 494; Fisher, supra,214 Cal.App.3d at p. 617.) Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are not sufficient for liability based upon a cause of action for intentional infliction of emotional distress. (Delfino v. Agilent Technologies, Inc. (2006)145 Cal.App.4th 790, 809 [52 Cal.Rptr.3d 376], citing Rest.2d Torts, § 46, com. d, pp. 72-73.) A properly plead cause of action for sexual harassment will constitute the outrageous behavior element of a cause of action for intentional infliction of emotional distress. (Fisher, supra, 214 Cal.App.3d at p. 618.)
 To the extent Suzan argues there was outrageous conduct based upon her pleading in the section 51.9 cause of action, the argument necessarily fails with our holding that summary judgment was properly granted due to the lack of severe or pervasive conduct as required by section 51.9. (SeeGaramendi v. Golden Eagle Ins. Co. (2005) 128 Cal.App.4th 452, 480 [27 Cal.Rptr.3d 239] [plaintiff's failure to establish "intolerable" working conditions necessary to support his cause of action for constructive discharge, necessarily defeats related cause of action for intentional infliction of emotional distress based upon the same facts due to a lack of proof of "`extreme and outrageous'" conduct].)
 As to the element of outrageous conduct, it bears emphasis that Suzan had been involved in a pitched battle with Pair and the other trustees of Mark's estate for five years, featuring seven petitions by Suzan involving Mark's trust and her son, Alex. In this context of this feud, the harsh and inappropriate language by Pair directed at Suzan at the King Tut exhibit does not rise to the level of outrageous conduct as that phrase is defined in California case law. (See Cochran v. Cochran, supra,65 Cal.App.4th at p. 498 [alleged death threat in a telephone message left by the defendant engaged in "an intimate relationship gone bad" with the plaintiff, was an example of "hostile unpleasantries which are intended to sting whoever sits at the delivery end," but which are beyond the reach of the tort of intentional infliction of emotional distress];Yurick v. Superior Court (1989) 209 Cal.App.3d 1116, 1128 [257 Cal.Rptr. 665] ["`there can be no recovery for mere profanity, obscenity, or abuse, without circumstances of aggravation, or for insults, indignities or threats which are considered to amount to nothing more than mere annoyances. The plaintiff cannot recover merely because of hurt feelings.'"].)
 Suzan also has not established the requisite degree of injury for intentional infliction of emotional distress. "Severe emotional distress means, *Page 1487 
then, emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." (Fletcher v. Western National Life Ins. Co. (1970)10 Cal.App.3d 376, 397 [89 Cal.Rptr. 78], citing Rest.2d Torts, § 46, com. j, pp. 77-78.) The extent of her injuries was described by Suzan as discomfort, worry, anxiety, upset stomach, concern, and agitation in the form of her heart racing. However, she suffered from these symptoms in relation to the litigation she filed involving the trust, although to a lesser degree. Pair's statements had no effect on her daily activities other than to cause her to miss a meeting to prepare for her deposition. This is not the degree of emotional suffering required for intentional infliction of emotional distress.
 DISPOSITION The judgment is affirmed. Respondent Christopher Pair is awarded costs on appeal.
 Mosk, J., concurred.
[1]All statutory references are to the Civil Code, unless otherwise stated.
[2]Because they share the same last name, we refer to Mark and Suzan and their son Alex by their first names, for purposes of clarity and not out of disrespect.
[3]The facts are undisputed for purposes of the summary judgment motion. However, Pair denies making the statements alleged by Hughes. Pair recognizes that Hughes's evidence must be viewed as true for purposes of summary judgment. His summary judgment motion therefore accepts the statements as true, despite his denial.
[4]Pair argued counsel for Suzan stipulated to the statements set forth in the text. However, the record of the deposition contains no formal stipulations to these facts.
[5]Section 51.9, as amended in 1999, provides as follows: "(a) A person is liable in a cause of action for sexual harassment under this section when the plaintiff proves all of the following elements:
"(1) There is a business, service, or professional relationship between the plaintiff and defendant. Such a relationship may exist between a plaintiff and a person, including, but not limited to, any of the following persons:
"(A) Physician, psychotherapist, or dentist. For purposes of this section, `psychotherapist' has the same meaning as set forth in paragraph (1) of subdivision (c) of Section 728 of the Business and Professions Code.
"(B) Attorney, holder of a master's degree in social work, real estate agent, real estate appraiser, accountant, banker, trust officer, financial planner loan officer, collection service, building contractor, or escrow loan officer.
"(C) Executor, trustee, or administrator.
"(D) Landlord or property manager.
"(E) Teacher.
"(F) A relationship that is substantially similar to any of the above.
"(2) The defendant has made sexual advances, solicitations, sexual requests, demands for sexual compliance by the plaintiff, or engaged in other verbal, visual, or physical conduct of a sexual nature or of a hostile nature based on gender, that were unwelcome and pervasive or severe.
"(3) There is an inability by the plaintiff to easily terminate the relationship.
"(4) The plaintiff has suffered or will suffer economic loss or disadvantage or personal injury, including, but not limited to, emotional distress or the violation of a statutory or constitutional right, as a result of the conduct described in paragraph (2).
"(b) In an action pursuant to this section, damages shall be awarded as provided by subdivision (b) of Section 52.
"(c) Nothing in this section shall be construed to limit application of any other remedies or rights provided under the law.
"(d) The definition of sexual harassment and the standards for determining liability set forth in this section shall be limited to determining liability only with regard to a cause of action brought under this section."